874 So.2d 456 (2004)
Vernon Lamar KITCHENS, Appellant
v.
JERRY VOWELL LOGGING and Mississippi Loggers Self-Insured Fund, Inc., Appellees.
No. 2003-WC-01464-COA.
Court of Appeals of Mississippi.
May 25, 2004.
*458 Yancy B. Burns, attorney for appellant.
Steven D. Slade, Meridian, attorney for appellees.
Before SOUTHWICK, P.J., THOMAS and CHANDLER, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. There are two broad and important categories of issues in this workers' compensation case, neither of which should detract from the other. One is a set of procedural matters arising from the assistance that a commissioner provided to the administrative judge who was evaluating this claim. The other is the merits of the resolution of the claim by the Workers' Compensation Commission. We find no error arising from the role that one of the commissioners assumed. We conclude, though, that the issue of permanent disability has not yet been properly resolved. The judgment is therefore reversed and the cause is remanded to the Commission for further proceedings.

FACTS
¶ 2. Vernon Kitchens was employed by Jerry Vowell Logging, a company that cuts timber and provides the logs to International Paper Company. Kitchens was a truck driver who injured his back in February 1999. The employer Vowell admitted the injury and its compensability but did not accept that its effects were permanent.
¶ 3. Kitchens was about forty years old at the time of his 1999 injury. He has an eighth grade education. His background included employment in automobile body repair and as a driver of tractor-trailer rigs. According to his testimony, his work as a driver for logging companies required him occasionally to lift more than fifty pounds, to use a chainsaw to trim loads, and to wrap and secure thirty-pound chains around the loads. Kitchens also stated that the job required that he sit in *459 his truck for as long as sixteen hours on some especially busy workdays.
¶ 4. The 1999 injury occurred when Kitchens attempted to jump onto a large logging vehicle called a "skidder." One of the skidder doors struck him across his lower back. He was treated first at a hospital and then at a number of clinics to which he was referred. Early in the treatment Kitchens' degenerative disc disease was diagnosed. The utility of surgery was initially doubted. Kitchens was referred for pain management treatment. Injuries to both of Kitchens' shoulders were discovered; an arthroscopic surgical procedure was performed.
¶ 5. Management of Kitchens' back problems proved difficult. Eventually a neurosurgeon evaluated his condition and recommended treatment by Dr. Howard Katz, who is a rehabilitation specialist called a "physiatrist." Dr. Katz provided the testimony that the Commission found especially enlightening and on which it largely relied. We will review that and the other evidence when we analyze the merits of the Commission's decision. Vowell Logging offered to rehire Kitchens at his former job at the same wage, with accommodations for certain work restrictions.
¶ 6. The hearing before the administrative judge occurred in February 2002. Her decision was not rendered until October 2002. She found that Kitchens had suffered no loss of wage earning capacity as a result of his injury while employed by Vowell Logging. That decision was affirmed by a 2-0 vote of the Commission. Commissioner Lydia Quarles did not participate in the appellate decision for reasons that we will analyze. The Attala County Circuit Court affirmed on the first level appellate review. Kitchens' further appeal has been deflected to this Court.

DISCUSSION
I. Commissioner's assistance to administrative judge
¶ 7. Just prior to oral argument on this appeal, the claimant moved to supplement the record with a November 18, 2003 report prepared by the Joint Legislative Committee on Performance Evaluation and Expenditure Review, Mississippi's so-called "PEER Committee." PEER reported on some of the activities of the Workers' Compensation Commission that appeared to affect this case. The report indicated that a commissioner had assisted an administrative judge who was having workload problems on six of her cases. One of the identified cases was the present one.
¶ 8. The PEER Committee gave its opinion about the validity of that assistance, a legal opinion that is not binding on the judiciary. The fact of the assistance, though, had been raised. We determined that the record should be supplemented. We are authorized to require a supplementation of the record so that it "truly discloses what occurred" and will "convey a fair, accurate, and complete account of what transpired" in the lower tribunal. M.R.A.P. 10(e) & (f). The possibility that the administrative judge's role in making the initial decision in the case may not have been what the record indicated, is what caused the order for supplementation.
¶ 9. The Commission responded by order of February 23, 2004. The agency took issue with our requiring the supplementation and simply presented a legal objection. Fortunately, Commissioner Lydia Quarles, whose role in certain cases has been questioned, was forthcoming. As a concurring opinion to the Commission order, she presented her explanation of events. This is the relevant factual portion *460 of her opinion, with most footnotes omitted:
I took documentary evidence (generally medical records, medical depositions, vocational reports, average weekly wage sheets and/or job search lists) and prepared a synopsis for [Administrative] Judge [Cindy] Wilson to utilize in her orders as she wished. As such, I have no independent recollection of the cases about which I assisted Judge Wilson; I only recall that I assisted her over the long 4th of July weekend in 2002. I kept no records or copies of my work product. I merely put the information on a floppy disk and delivered it to Judge Wilson. Judge Wilson identified the orders in question for PEER's investigator, as I was unable to do so. The Kitchens order in particular is, according to Judge Wilson, one of the orders for which I provided her an evidentiary synopsis. That may be so. But I neither drafted nor wrote the Kitchens order for Judge Wilson. Nor did I take any part in Judge Wilson's decision-making process. Actually, I cannot even say affirmatively to the Court that Judge Wilson utilized my material in whole or in part in the Kitchens order because she has never told me to what extent she relied on my assistance....
The PEER's report reflects that Judge Wilson had fallen substantially behind in releasing orders. This is true. There are complicating explanations which caused the delay, but no excuses for it.5 It had become apparent in the spring of 2002 that Judge Wilson was behind. However, the Commissioners were aware of the various complications of her situation and were willing to "work" with Judge Wilson. On various occasions, I suggested that the Commissioners do something to assist Judge Wilson. In the past, the Commission has handled these problems in the various ways explained in note 5, and I explained these various ways to Chairman [Ben Barrett] Smith. However, no action was taken for over three months after the Commissioners realized that the problem had become acute. Thus, there existed an exceptional period of delay with regard to certain claims which had been heard by Judge Wilson, but not yet decided. Therefore, I determined to assist Judge Wilson. We discussed her problems and our goal became to have Judge Wilson "caught up" before she left for the bar convention on July 7, 2002. I am happy to say that we did precisely that. Judge Wilson undertook an enormous workload during the month of June, 2002, and I helped her by serving as a law clerk and typist....
Knowing that delay has a devastating impact on a claimant who is injured and out of work, and realizing that delay may also prejudice the employer and carrier by exacerbating the amount of penalties and interest which may have to be paid under statute, I believed then and believe now that it was the Commission's duty to take action and, that my actions in this regard were proper.
¶ 10. After receiving this response to our order, we requested supplemental briefing from the parties so that we would have the benefit of their analysis. Both parties responded.
a. Propriety of supplementation of the record
¶ 11. We have already referred to the rules that allow us to assure that the appellate record accurately reveals what occurred in the lower tribunal. M.R.A.P. 10(e) & (f). We found relevance to the possibility that one of the principal orders of the lower tribunal may not reflect the decision-making of the individual whose order it purports to be. More common *461 examples of assistance with orders are when a judge adopts verbatim the work of one of the parties. In that situation, which is an understandable reality of the heavy work-load of judicial officers at the fact-finding level, the appellate standard of deference is relaxed and a more searching review is made. Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995). This has been applied to decisions of administrative judges as well. Greenwood Utilities v. Williams, 801 So.2d 783, 788 (Miss.Ct.App. 2001).
¶ 12. What was alleged in the PEER Committee report was a variation on that theme. We sought explanation of the nature of the commissioner's role. We needed to know those circumstances at least in general contours before we could determine the effect of a commissioner's involvement.
¶ 13. What we may not seek to have explained are the thought processes behind a judgment. "A judgment is a solemn record. Parties have a right to rely upon it. It should not lightly be disturbed, and ought never to be overthrown or limited by the oral testimony of a judge or juror of what he had in mind at the time of the decision." Fayerweather v. Ritch, 195 U.S. 276, 307, 25 S.Ct. 58, 49 L.Ed. 193 (1904), quoted in Munn v. S.F. Bowser & Co., 114 Miss. 500, 75 So. 372, 373 (1917). That is why a judgment must "speak for itself." This rule has been applied to agency decision-making as well:
Much was made of his disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary "has a quality resembling that of a judicial proceeding." Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that "it was not the function of the court to probe the mental processes of the Secretary." Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected.
United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (citations omitted). Inquiry may be had, though, "as to relevant matters of fact as long as the factual matters do not probe into the mental processes employed in formulating the decision." Western Elec. Co., Inc. v. Piezo Tech., Inc., 860 F.2d 428, 431-32 (Fed.Cir.1988). We have maintained this distinction by not seeking knowledge of the decision-maker's thoughts but only of someone else's actions.
¶ 14. Because of the issues that validly can arise in appellate review of an order that is more, or less, than just the findings and conclusions of the person whose role it was to reach that decision, the limited supplementation that we ordered was appropriate.
b. Respective roles of administrative judges and commissioners
¶ 15. The Workers' Compensation Commission is led by three individuals appointed by the governor. Miss.Code Ann. § 71-3-85 (Rev.2000). The Commission itself has the authority to investigate and determine claims for compensation. Miss. Code Ann. § 71-3-47 (Rev.2000). That section alludes to the practice of using administrative judges in the initial stages of the process:
Informal conferences and hearings in contested cases may be conducted by a duly authorized representative of the commission. Upon the conclusion of any *462 such hearing, the commission's representative shall make or deny an award, and file the decision in the office of the commission.
Id. The Commission may appoint not more than eight administrative judges; when the judges are "conducting such hearings and making decisions upon claims," they "shall have the authority of a commissioner." Miss.Code Ann. § 71-3-93 (Rev. 2000).
¶ 16. What these provisions are allowing us to gain is an appreciation of the role of an administrative judge. By delegation, the judge receives the authority of a commissioner over a case. That is a little misleading, as a single commissioner has no authority to resolve a claim. Whatever else the language in section 71-3-93 might mean, we interpret it as a recognition that when an administrative judge is delegated responsibility for a claim, that person receives the full power of the Commission itself. When an appeal is resolved by the Commission, the administrative judge's decision become moot. Procedural rules have been adopted by the Commission to structure the initial review and the appeals. MISS. WORKERS' COMP. COMM'N PROC. RULES 1-23.
¶ 17. The Supreme Court has relevantly interpreted the effect of an administrative judge's findings of fact upon review by the Commission. The Court has found that the Commission may accept entirely, only in part, or totally reject those fact-findings, even though the Commission itself almost never has a separate evidentiary hearing and relies solely on the record and briefs presented to it. Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1245 (Miss. 1991); see MISS. WORKERS' COMP. COMM'N PROC. RULE 9 (Commission may receive evidence). There may be substantial evidence to support the administrative judge's findings, but so long as there also is substantial evidence to support the Commission's contrary findings, the latter will be upheld. Day-Brite Lighting v. Cummings, 419 So.2d 211, 213 (Miss.1982). The premier analysts of Mississippi workers's compensation law have explained what this means:
It is the duty of the Commission to determine the effect of the weight of the evidence and give effect to the preponderance of the evidence. The Commission is not an appeals court sitting in review of the administrative judge as trial court; the Commission is the original fact finder.
Bradley & Thompson, Workers' Compensation Law § 76:145, in 9 ENCYCLOPEDIA OF MISSISSIPPI LAW (Jackson & Miller ed.2002), at 329 (footnotes omitted); see also § 76:167.
¶ 18. By statute, the judge is the "representative" of the Commission, its agent, and its employee in the exercise of the Commission's claim-resolving authority. The administrative judge is not an independent arbiter entitled to deferential review by the Commission, as a trial judge is independent of her reviewing appellate court.
¶ 19. What this statutory review highlights is that the Mississippi Workers' Compensation Act is consistent with the usual practice for agencies. Administrative procedures are not analogous to those for the judicial processing of claims. At the most basic, an administrative agency may have a combination of powers that look like those of each of the three branches of government: enforcement power that is similar to that of the executive branch, rule-making authority that is quasi-legislative in nature, and dispute resolution jurisdiction like that of the judiciary. Courts err when they insist on agency procedures modeling themselves on the traditional view of the separation of powers. See, *463 Dean v. Public Employee Retirement System, 98-CA-0033-COA (Miss.Ct.App. Apr. 20, 1999), rev'd 797 So.2d 830, 837 (Miss. 2000) (Supreme Court held that agency could merge investigatory and adjudicatory functions on claims so long as consistent with statute); Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (agency adjudicators may properly have earlier participated in an investigation).
¶ 20. The Commission has oversight and ultimate responsibility for what occurs within that body. The need for this agency to respond to a perceived workload problem with one of its administrative judges was not a unique occurrence. Whether the response was appropriate, or at least whether it invalidated the final ruling by the Commission itself, can be helpfully measured with the yardstick of other situations in which agencies have prodded their administrative judges.
¶ 21. One of the situations that has drawn the most scholarly comment was a serious claims workload problem in the 1980's in the United States Social Security Administration (SSA).
The SSA handles 1.2 million disability applications a year.... Approximately seventy-five percent of SSA adjudications terminate at the agency level, after consideration of written documents from doctors, hospitals, and applicants. A dissatisfied applicant has a right to appeal a denial of benefits to an SSA administrative law judge, who makes an independent determination of disability after conducting an oral evidentiary hearing. The SSA's seven hundred ALJs adjudicate over 280,000 cases per year.... Applicants dissatisfied with an ALJ's decision can appeal to the SSA's Appeals Council and, if still dissatisfied, to a federal district court.
. . .
When the SSA examined the causes of delay in its disability decisionmaking, variation in the work habits and productivity of its 700 ALJs emerged as a clear culprit. The average ALJ decides 432 cases per year, but the productivity variance among ALJs is enormous. Individual ALJs decide as many as 1440 and as few as 120. Since cases are assigned to ALJs randomly, differences in the mix of assigned cases cannot explain more than a tiny fraction of this variation in output.
Once the SSA detected this large productivity differential, it began looking for differences in work habits that could explain the variance. It identified at least one explanatory factor. Some ALJs write their own opinions, while others delegate this task to staff attorneys; ALJs who delegate opinion writing decide up to twice as many cases as ALJs who refuse to delegate the task.
The SSA addressed this source of delay in two ways: it strongly urged ALJs to delegate opinion writing to staff attorneys, and it informed ALJs that it had established a productivity goal of 338 decisions per ALJ per year. The SSA expressed particular concern about ALJs who decide fewer than 240 cases per year. It communicated with individual ALJs in this category, urging them to increase their productivity and suggesting methods of doing so. It also mandated special training programs for those who remained in the low productivity category, and, when all else failed, it notified consistently low productivity judges that if productivity did not improve," for cause" removal proceedings would be initiated before the Merit Systems Protection Board....
Richard J. Pierce, Jr., "Political Control Versus Impermissible Bias in Agency Decisionmaking: Lessons From Chevron and *464 Mistretta," 57 U. CHI. L.REV. 481, 501-504 (1990) (footnotes omitted).
¶ 22. Some courts questioned the use of statistical information on productivity as the source of quality review, but Professor Pierce found "that SSA's methods of control were entirely proper and would be affirmed by the Supreme Court." Id. at 483-84; see also RICHARD J. PIERCE, JR., II ADMINISTRATIVE LAW TREATISE § 9.10 (4th ed.2002), at 693-701. The important matters for us in this SSA example are the obligation of agencies to oversee the work of administrative judges employed by the agency, and the discretion in choosing the means of doing so.
¶ 23. Administrative judges who are employees and agents of their agency do not have the independence of traditional judges. That is true as a matter of fact, but also as a matter of law.
What are the duties of the [administrative law judge]? The ALJ is charged with furtherance of agency policy and must remain oriented to agency policy in adjudicating. Further, the ALJ has a narrower jurisdiction or focus; she is a specialist as distinguished from a generalist decision maker. ALJs operating in connection with different agencies have widely diverse and varied statutory tasks. Unlike Article III judges, ALJs exist within a bureaucratic structure; they are employees over whom there is actual or apparent executive authority. Even where there are in effect provisions for internal ALJ independence, there is an inherent conflict between the perceived need for independence and the need to evaluate and to make the performance of ALJs uniform and consistent with agency policy....
John L. Gedid, "ALJ Ethics: Conundrums, Dilemmas, and Paradoxes," 11 WIDENER J. PUB.L. 33 (2002). Administrative judges employed by their agency need to be neutral and unbiased as to the parties before them, but they are not similar to common law judges such that impropriety exists when they respond to policy directives from others, namely, those in charge of their agency. "Judge" may not even be the best label for this position. These individuals definitely are dispute-resolving instruments of the agency, but the judicial image is too restrictive. Judges are not agents, but administrative judges employed by their agency are. We know that as to the Workers' Compensation Commission because the statute calls them "representatives" and staff members.
¶ 24. We now turn to the specific acts raised in this case to determine whether the assistance given by a commissioner to an administrative judge invalidated the agency action that is under review.
c. Commissioner assistance to administrative judge
¶ 25. Commissioner Quarles has informed us that she prepared factual summaries for the administrative judge in order to relieve that judge's backlog. The Workers' Compensation Act recognizes that the Commission has ultimate responsibility to administer the Act and to oversee the staff needed for that mission. Miss.Code Ann. § 71-3-93 (Rev.2000). Oversight of the staff may uncover problems that the Commission in its discretion should address. The problem facing the Commission when the assistance was provided to the administrative judge in this case was one of timely processing of claims.
¶ 26. The following elements of the relationship between the administrative judge and the Commission appear relevant in the analysis:
1. The administrative judge's decision, if appealed as this one was, has no independent *465 weight and can be rejected even on findings of fact so long as there is substantial evidence to support the Commission's decision.
2. The administrative judge is the agent of the Commission. Statutorily at least, it is only at the discretion of the Commission that the judge assists in the deciding of claims: the Commission has "full power and authority to determine all questions relating to the payment of claims for compensation." Miss.Code Ann. § 71-3-47 (Rev.2000).
¶ 27. The individual entitled to make a decision that will become final if not appealed, but whose decision will have no legal weight at all once the Commission acts on an appeal, had assistance from one of those who usually reviews the decision. Though the statutes seemingly make the use of an administrative judge to conduct the initial hearing just an option, the Commission rules do not recognize a procedure for the Commission to retain a case or retrieve it once assigned in order to reach the initial decision. MISS. WORKERS' COMP. COMM'N PROC. RULE 7. In addition, the rules and statutes do not provide for a decision to be made by a single commissioner and then for an appeal to the other commissioners. The record before us does not reveal that kind of appropriation of decision-making authority by a commissioner. We examine for whether what did occur still resulted in a distortion of the necessary process.
¶ 28. What occurred here needs to be reviewed within the context of the Commission's responsibility to oversee its staff. Additional staff might be provided to judges who fall behind. Budgetary problems, though, may prevent the Commission from pursuing what the Social Security Administration did in the backlog problems that we discussed, namely, providing staff attorneys to write drafts of opinions. Alternatively or additionally, various forms of mentoring of administrative judges by commissioners could be offered. Here those options were merged. There was no extra legal staff at the Commission, so the legal knowledge of one of the commissioners was offered. Of course, a commissioner is not just another attorney sent to help.
¶ 29. We find nothing in Commissioner Quarles' description of events to indicate that she took charge of the administrative judge's decisionmaking. The commissioner prepared a factual summarywhich admittedly may channel the course of the conclusions. The administrative judge then engaged in the level of independent contemplation that she felt was needed and wrote the fact-findings and legal conclusions. Just as with assistance through sample findings and conclusions offered by each party, or by the drafting of an opinion by a staff attorney or law clerk, assistance from an agency official does not void the judicial deliberations. The decision reached was one which the judge was willing by her signature to endorse as her own. The form of assistance may be unusual, but it still was just assistance. Even if the judge's thought process was somehow affected, that is beyond the reach of proper inquiry. Morgan, 313 U.S. at 422, 61 S.Ct. 999.
¶ 30. There would have been a more destabilizing set of facts if the commissioner had participated in the appellate review of the decision. The arbiter who renders the initial decision on an adjudicated matter should not then participate in a review of her own decision. Dean, 797 So.2d at 837 (decided as a matter of statutory construction, which avoided the due process issue). Commissioner Quarles, however, recused herself from the de novo review by the Commission itself.
¶ 31. The unusual facts of this case necessitate some care in our review of the *466 nature of administrative processing of claims. In summary, an administrative judge within the Workers' Compensation Commission is the agent of the Commission; her decision is discardable entirely by the Commission even if supported by substantial evidence. In this case, the administrative judge issued the actual decision and on agency appeal the assisting commissioner did not participate. Accordingly, we find no procedural invalidity to the Commission's resolution of this case.
¶ 32. We expect that workload problems will arise in the future at this Commission and at other agencies who employ administrative judges. Transparency of the approach taken to relieve those problems, at least when the relief is in the form of agency superiors' assistance to lower-level decision-makers, would remove some of the concerns that arise.
II. Merits of Commission's final judgment
¶ 33. The Commission adopted the decision of the administrative judge that disallowed any benefits based on a permanent loss of wage earning capacity. That decision largely relied on the evidence provided by Dr. Howard Katz. He testified in a deposition that was introduced into evidence that Kitchens could continue to perform the essential tasks of a logging truck driver. We will review some of the treatment history as we summarize the evidence.
¶ 34. Dr. Katz believed that Kitchens was exaggerating his symptoms. Lon Alexander was the neurosurgeon who had sent Kitchens to Katz. After Dr. Katz referred the claimant back to Dr. Alexander, the latter physician determined that Kitchens likely needed surgery. A second doctor concurred. In January 2001, a lumbar diskectomy was performed.
¶ 35. A functional capacity examination report was prepared on March 15, 2001. This report stated that Kitchens could only work at the sedentary level as defined in the Dictionary of Occupational Titles. He could not sit for more than a third of an eight-hour day, or stand at all during the workday.
¶ 36. Eleven days after this functional capacity exam, Dr. Katz again examined Kitchens. He did not agree that the claimant was so limited. Kitchens had been complaining of pain after the January diskectomy. He returned to Dr. Katz for evaluation. Dr. Katz found that Kitchens had on the day of the examination, March 26, 2001, reached maximum medical improvement. As a result of the March exam, Dr. Katz determined that Kitchens had persistent lumbago and degenerative disc disease, which resulted in an impairment rating of eight percent. Light duty work was possible. Continuing pain and physical limitations existed, but Dr. Katz stated that it was his "gut feeling" that these "work restrictions and his permanent impairment" were "not attributable to a traumatic cause." Instead, the preexisting degenerative disc disease was the most likely basis of the problems.
¶ 37. Dr. Katz found that Kitchens suffered from depression, that no objective findings from his examination supported the problems that Kitchens says he had, that he was quite overweight, and that "he's just a chronic pain patient." Dr. Katz thought light duty work that Kitchens could perform included driving a truck such as he had been doing at the time of injury.
¶ 38. On July 18, 2001, Kitchens was given a Mississippi Department of Transportation physical examination. Kitchens testified that he went to the doctor who conducted the examination because of his high blood pressure. The only document *467 from this exam that is in the record is a one-page form used to note the results of different tests. The section for comments stated that Kitchens was unable to sit for prolonged periods and could not lift more than 25 pounds. The only specific reference to the requirements for getting a commercial drivers license was that Kitchens' blood pressure was "out of DOT range for passing exam." Kitchens' license was not then subject to being renewed, and apparently this particular physical exam had no effect on his license. There has never been any evidence offered that Kitchens' hypertension was in anyway caused by his employment.
¶ 39. Additional evidence at the administrative hearing came from a vocational and rehabilitation specialist, who testified about a labor market survey. He stated that Vowell Logging had offered Kitchens a truck driving job in which he would not need to throw chains around the logs or lift heavy objects. He would only have to unfasten the chains and drive the truck. That witness also stated that he could not find some of the employers that Kitchens said he had contacted and had refused him employment. Several employers in the area in which Kitchens lived were contacted and said that they were hiring people of Kitchens' skills and limitations. Kitchens at the hearing stated that he had not been aware of those potential employers and had not contacted them.
¶ 40. Dr. Katz testified that Kitchens had a permanent injury, that he could perform light duty as defined by the Dictionary of Occupational Titles, and that he had an eight percent impairment rating to his whole body. Light duty was described as being able to "stand and walk upwards to and in excess of two-thirds of an eight-hour workday. He does need to be allowed to take breaks as necessary in standing and/or sitting." The doctor stated that driving a truck over long distances would be within Kitchens' abilities for light duty work. This conclusion was inconsistent was some of the other evidence, but it also was evidence from a physician who had been directly involved with Kitchens' treatment for an extended period of time.
¶ 41. There are two separate conclusions that might flow from the evidence to support the denial of permanent benefits. One is that Kitchens' various physical limitations were unrelated to his job injury. The claimant has a variety of ailments for which his employer is not responsible. But the administrative judge's findings adopted by the Commission did not state that Kitchens was physically impaired but then endorsed Dr. Katz's "gut feeling" of a non-traumatic origin of the impairment.
¶ 42. The other possible evidentiary interpretation in support of the result is that Kitchens could return to his customary duties as a logging truck driver and had no loss of wage earning capacity. The administrative judge in the opinion adopted by the Commission found that "claimant may return to driving a truck and since the testimony elicited at hearing by Mr. Vowell reflects that he is willing to rehire claimant with accommodations and at the same rate of pay," the claimant failed to prove a loss of wage-earning capacity. We find error in making that simple causative link.
¶ 43. If in fact Kitchens has a permanent, employment-caused disabilityand Dr. Katz gave him an eight percent impairment ratingthe fact that his former employer is willing to rehire him with adjusted job requirements at the same pay does not sustain the finding of no loss of wage-earning capacity. There is no guarantee of permanent future employment with that employer even assuming that Vowell Logging has the best of intentions.
*468 ¶ 44. What the workers' compensation rules examine is the likelihood that the marketplace would provide someone in the claimant's physical condition with the same wages as he had been making before the injury. If the claimant has been rehired at wages at least as high as before the injury, there is a rebuttable presumption that there is no loss of wage-earning capacity. Agee v. Bay Springs Forest Products, Inc., 419 So.2d 188, 189 (Miss.1982). The similar wage is rebutted as proof of no disability if it is being paid at least in part for charitable purposes. Otherwise, a person entirely paralyzed by an injury and no longer able to perform his job at all but who is being paid his former wage, would have no loss of wage earning capacity. So-called "sympathy wages" do not prevent a finding of loss of wage earning capacity:
It is the contention of the claimant that although the proof does show that he was earning more than he made prior to his injury, the uncontradicted proof shows that prior to his injury claimant was strong, in good health, doing a job which required considerable exertion and strain. Not only was he able to perform his work well but also able to engage in all activities of a normal, healthy person including those requiring considerable strength and physical ability. That his injuries resulted in severe physical limitations in that he can no longer do heavy lifting, he is short of breath, tires easily, hurts at night after doing his work. He cannot engage in any recreational activity that he could prior to his injury. The injury moreover has resulted in his life being substantially changed and all his activities restricted. Under these circumstances appellant contends that it is obvious that his injuries have resulted in a severe limitation on his job opportunities.
Cox v. Int'l Harvester Co., 221 So.2d 924, 925 (Miss.1969). What must be compared for workers' compensation benefits purposes are the actual wages before the injury and the earning capacity after the injury. Any other approach to evaluating the entitlement to benefits would ignore "the temporary and unpredictable character of post-injury earnings." Id. at 927.
¶ 45. In the present case, the proof does not show that Kitchens was in reasonably good health before the injury and suffered from physical limitations only after the job-related injury. Even so, there is evidence through the functional capacity examination that Kitchens was not able to sit for long periods or lift the weight typically needed by a logging truck driver. That evidence might be found unpersuasive in light of Dr. Katz's opinion. However, just because Kitchens' former employer was willing to accommodate those problems, International Harvester instructs that this is not the same as saying his earning capacity remained unchanged.
¶ 46. It could be that the degenerative disc problem was in fact the cause of the newly recognized work limitations. Instead, the workplace injury might have been the source. It also could be that the injury and the disease worked in combination. When a work injury and a pre-existing disease combine to cause impairment, then there is liability for benefits. Whether there is an apportionment resulting from the causes depends on whether before the injury the disease had caused a loss of some wage earning capacity. See Stuart's Inc. v. Brown, 543 So.2d 649 (Miss.1989); Bradley & Thompson, Workers' Compensation Law § 76:89, in 9 ENCYCLOPEDIA OF MISSISSIPPI LAW (Jackson & Miller ed.2002), at 249-52.
¶ 47. The Commission is the ultimate fact-finder. We cannot determine from the Commission's adoption of the administrative *469 judge's findings, whether Kitchens' limitations were found to arise from his workplace injury. The Commission accepted Dr. Katz's view that Kitchens could continue as a truck driver. But whether his continuation was despite a new industrial disability was not addressed. The administrative judge simply found that because the present wages were the same, there was no loss of wage earning capacity. That finding was adopted by the Commission. Our review of the precedents causes us to conclude that the administrative judge and the Commission must dig more deeply into causation and work capacity than simply relying on current wages.
¶ 48. We are not requiring a finding of a permanent loss of wage earning capacity. We are remanding so these additional issues will be considered in the fact-findings and legal conclusions.
¶ 49. THE JUDGMENT OF THE CIRCUIT COURT OF ATTALA COUNTY AFFIRMING THE DECISION OF THE WORKERS' COMPENSATION COMMISSION IS REVERSED AND THE CAUSE IS REMANDED TO THE COMMISSION FOR ADDITIONAL PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS ARE ASSESSED TO THE APPELLEES.
KING, C.J., BRIDGES, P.J., THOMAS, LEE, IRVING, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.
5. [Footnote by Commissioner Quarles.] Obviously, in such a situation there is no "good case scenario." In the past, the Commission has handled an Administrative Judge's problems of delinquency in the issuance of orders in several ways: (1) the "historical" cure, which is to take the Judge who is delinquent "off the road," i.e., cancel hearings for this Judge until s/he is caught up; (2) request other Administrative Judges to write a couple of the delinquent judge's orders in effort to get him/her caught up, which routinely occurs when an Administrative Judge resigns or retires from the Commission with outstanding orders pending; or (3) requesting the Commission's staff attorneys to lend a hand.