GRIFFIS, J.,
for the Court.
¶ 1. Open MRI, LLC, Compass Imaging, LLC, and Cedar Lake Open MRI, LLC, (collectively, the “Appellants”) appeal the grant of a certificate of need to Coastal County Imaging Services, LLC, (“Coastal”) to provide open magnetic resonance imaging (“MRI”) services. The Mississippi State Department of Health (the “Department”) granted the certificate of need.
¶ 2. On the initial appeal, the Hinds County Chancery Court affirmed. In this appeal, the Appellants argue that the Department erred: (1) in awarding a certificate of need based on incorrect information; (2) in crediting Coastal with providing a full range of diagnostic imaging modalities; (3) in “blindly” accepting the applicant’s misleading financial projections and failing to recognize the projections were not based upon generally accepted accounting principles as required and (4) in disregarding and violating its own rules. We find no error and affirm.
FACTS
¶ 3. Coastal is a closely held Mississippi limited liability company, made up of six physicians. Coastal is a radiology practice group. On December 23, 2003, Coastal applied for a certificate of need to provide open MRI services[1] to patients, including Medicare and Medicaid recipients.[2] On February 13, 2004, the Department requested that Coastal provide supplemental information. The Department asked that the information be received by March 1 or the application would be held over until the next review cycle. Coastal submitted some of the requested supplement on March 10. The Department deemed the application complete on April 1, and set it for review during the April review cycle. Coastal submitted the remainder of the requested information on April 26.
¶ 4. In May, the Department’s staff analysis was conducted. The staff analysis considered all of Coastal’s submitted information. The staff analysis recommended that the Department grant the certificate of need. The staff analysis stated, “[i]n accordance with Section 41-7-197(2) ... any person may request a public hearing on this project within 20 days of publication of the staff analysis. The opportunity to request a hearing expires on June 3, 2004.”
¶ 5. The Appellants requested a hearing. The Appellants offer open MRI services in the same general service area. However, they are not qualified to accept Medicare and Medicaid patients. The hearing was held on August 31 through September 2, 2004. The hearing officer, David Scott recommended approval of the certificate of *816 need. He adopted Coastal’s factual findings. Thereafter, the State Health Officer issued a final order and concurred with the findings of the hearing officer.
STANDARD OF REVIEW
¶ 6. When this Court reviews a decision by a chancery or circuit court concerning an agency action, it applies the same standard of review that the lower courts are bound to follow. Miss. Sierra Club v. Miss. Dep’t of Envtl. Quality, 819 So.2d 515, 519(1115) (Miss.2002). The standard of review of the Department’s order on a certificate of need is set by statute:
The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal.
Miss.Code Ann. § 41 — 7—201 (2)(f) (Rev. 2005). This is merely a restatement of the standard of review applicable to administrative agency decisions. Miss. State Dep’t of Health v. Natchez Cmty. Hosp., 743 So.2d 973, 976(¶9) (Miss.1999). The court must look at the full record in deciding whether substantial evidence exists to support the agency’s findings. Pub. Employees’ Ret. Sys. v. Marquez, 774 So.2d 421, 427(¶ 20) (Miss.2000). Where a judge adopts a party’s proposed findings verbatim, the usual deference to fact findings is somewhat lessened, although it is not de novo. Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1264-65 (Miss.1987). In such a case, the appellate court must review the findings “with a more critical eye to ensure that the trial court has adequately performed its judicial function.” Id. at 1265. This rule has been applied to administrative agencies as well. Kitchens v. Jerry Vowell Logging, 874 So.2d 456, 461(¶ 11) (Miss.Ct.App.2005); Greenwood Utils, v. Williams, 801 So.2d 783, 788(¶ 14) (Miss.Ct.App.2001).
ANALYSIS

I. Did the Department award the certificate of need based upon incorrect information?

¶ 7. The Appellants’ initial issue concerns the number of existing MRI units in the area. The number of existing MRI units are used by the Department to assess Coastal’s evidence of need for any additional units. Coastal counters that this confusion was cleared up at the hearing, and the Department correctly accounted for all existing units.
¶ 8. The State Health Plan[3] sets out several criteria for a certificate of need to be granted. The first is designated as the “Need Criterion.” To satisfy the Need Criterion, “[t]he entity desiring to acquire or otherwise control the MRI equipment must document that the specified equipment shall perform a minimum of 1,700 procedures per year by the end of the *817 second year of operation.” Miss. State Health Plan, FY %00h at XI-46.
¶ 9. In the case of freestanding facilities such as Coastal, the affidavit method allows the applicant to establish this criteria. The Department accepts affidavits by physicians, wherein they estimate how many referrals they expect to give to Coastal. If, by virtue of the affidavits submitted, Coastal can show that it expects to perform at least 1,700 procedures per year, by the end of the second year, the Need Criterion is satisfied. Appellants admits that Coastal satisfied the Need Criterion through the use of the affidavit method. Specifically, even discounting the alleged “untimely” affidavits, affidavits were submitted into evidence that Coastal was expected to perform 1,884 procedures in the second year.
¶ 10. The Department then does a utilization calculation based on the number of existing MRI units in order to credit or discredit these affidavits. The Department takes the total number of MRI procedures performed in the area, divided by the total number of operating units in the area, to come to an average number of procedures per unit. This was further explained during the testimony of Rachel Pittman, the Department’s Chief of the Division of Health Planning and Resource Development, when she testified:
A. We look at historical procedures to determine how many are being done in the area, and also to determine whether there is additional capacity in that area.
[[Image here]]
A. So if — say if — if you look at the total for the area and it does — and calculate and it doesn’t come out, if they’re not doing — if they’re not at optimum, rather the total procedures, then we would not consider there to be further capacity.
BY HEARING OFFICER:
Okay. Where — where in the criteria does it provide that there has to be additional capacity? Is there any — anywhere in this that says that there has to be additional capacity in order to grant a CON?
A. I don’t believe so.
BY HEARING OFFICER:
Okay. So let’s — let’s just look at General Hospital Service Area 7. Let’s make an assumption that every one of these, and I’m just throwing out a hypothetical to you, every one of these were only doing 1,000 procedures each, okay, but you have affidavits from — from doctors that say, “Oh, you know, we’ll provide enough procedures that this new one will do 2,000,” okay, clearly meet the 1,700 requirement, but none of the others are doing that many, how would that affect the Department’s recommendation?
A. If none of the others are doing the — the numbers that the applicant is projecting, then we will consider that their — their—we would not consider that their projections would be accurate because the area’s not providing the referrals—
BY HEARING OFFICER: Okay.
A. —sufficient enough to come up with that number.
[[Image here]]
BY HEARING OFFICER:
So it provides some credibility to the— to the affidavits?
A. It does, yes, sir.
¶ 11. Coastal is located within an area designated by the Department as General Hospital Service Area 7 (“GHSA-7”). This area encompasses Pearl River, George, Stone, Harrison, Jackson, and Hancock counties. The staff analysis listed thirteen fixed and/or mobile units with *818 in the area. The 2004 State Health Plan accounted for the same thirteen units in the GHSA-7 area. Miss. State Health Plan, FY 200Ji. at XI-17. The figure is based on twelve units actually existing and operating in the area during fiscal year 2002, and one unit for which a CON was granted in Orange Grove. The Orange Grove CON was granted in 1997, but, as of the hearing in 2004, the hospital had not obtained the unit. Therefore, the staff analysis counted twelve units for its calculations.
¶ 12. The staff analysis determined that the GHSA-7 units were performing an average of 2,045 procedures in 2001, 2,394 procedures in 2002, and 2,648 procedures in 2003. The optimum level set by the Department is 2,000 procedures. The Department concluded that units in GHSA-7 have been performing above the optimum level and will continue to do so, as there was evidence that the total procedures will continue to increase each year. Therefore, the staff analysis considered the estimates produced by the affidavits to be accurate.
¶ 13. At the hearing, Pittman further testified:
Q. Just to make sure we understand this is 2004. Tell me: How many units are there in — in the Hospital Service Area 7?
A. There are 13 CON approved, with 12 operating.
Q. Twelve operating? Okay. Now, when you consider that there’s 12 here, and testimony will show later on that the contestants in this case is Open MRI, in — in that State Health Plan, they credited the contestants with what? One mobile unit?
A. Right.
[[Image here]]
Q. If you will look at Page 3 of the staff analysis. If you would, please. Again, for the purpose of the application under the fiscal year 2004 Plan, there were only, as you stated, 12 operating units in Service Area 7. After' — for fiscal year 2003 and— and after that, then the contestants in this case would only have been operating with two fixed rather than a mobile?
A. No. Actually, they would have two fixed and one mobile.
Q. Okay. And that would be how many total units, then?
A. Fourteen.
¶ 14. On cross-examination, counsel for Open MRI questioned Pittman about the number of MRI units listed in the staff analysis:
Q. Okay. Now, we’re going to get down to — Open MRI. Do you see that?
A. Yes.
Q. Now, have you had a chance to go back and look at the CON file for Open MRI to determine how many sites and units they have?
A. I’ve looked at the files. I can’t remember exactly how many sites they serve with the mobile unit, but as of the 2002 data, they had one unit.
Q. I’m sorry?
A. I think they only had one unit as of 2002 data that’s in the Plan.
Q. Okay. Do you know how many units they have today?
A. I believe they have three today, two fixed and one mobile.
[[Image here]]
Q. Okay. Now, the MRI split and the change of those from mobile to fixed sites occurred in 2002, correct?
A. That’s correct.
*819 Q. So they would have been known and should have been part of the 2004 State Health Plan, correct?
A. No.
Q. And why is that?
A. The 2004 State Health Plan became effective July—
Q. Of 2003?
A. Okay. Okay. They become effective July 3 of 2003; however, the data— the — the letters that authorized the mobile — the fixed unit were August of 2002 as well as — December of 2002. The information contained here for 2002, I think there’s a cutoff date of maybe like April of 2002 when they — when they got all the information in so it was — that was probably too late to be included in the 2002 data.
During re-direct, Pittman clarified:
Q. You would agree to me — agree with me that for the fiscal year 2004 State Health Plan, the controlling date is the end of fiscal year 2002? Those are the numbers set forth? Is that correct?
A. That’s correct?
Q. And so as of June 30, 2002, you would agree that the contestants in this matter were still operating a mobile unit? They had not converted any of those — any of [sic] that mobile sites [sic] to a fixed unit?
A. That’s correct.
[[Image here]]
Q. Okay. So look back again and tell us and for the record how many operating units there were as of June 30, 2002, the effective date or the operative date that we consider the 2004 Health Plan.
A. It’s 12.
¶ 15. Coastal’s health planning expert Dr. John C. Hyde, III, did count the two additional Open MRI units in his calculations, and concluded that even with fourteen units, the average procedure per unit was still well above the optimum range.
¶ 16. In 2001, there were 24,535 procedures in GHSA-7. With fourteen units, this is an average of 1,753 procedures per unit. In 2002, there were 28,731 procedures. With fourteen units, this is an average of 2,052 procedures per unit. In 2003, there were 31,834 procedures. With fourteen units, this is an average of 2,274 procedures per unit. The evidence was that the number of procedures projected into the future was expected to continue to grow. There was further testimony that local Medicare and Medicaid patients were forced to go to Jackson or Mobile for open MRIs, or go without them altogether. Dr. Hyde testified that if Coastal opens, these patients would be referred to Coastal instead, which further increases the amount of procedures expected to be performed in the future. Even counting all fourteen units, the units existing and operating in the area at the time were all performing above the optimum level and were predicted to perform even more procedures the next year. Therefore, the Department’s decision to give credibility to the affidavits presented by Coastal was supported by the evidence.
¶ 17. Appellants nevertheless argue that there were a total of sixteen existing units and refusal to count all sixteen was arbitrary and capricious and against the evidence. There were fourteen units in existence and actually operating at the time of the hearing. As set out previously, there was one outstanding certificate for Orange Grove. At the time of the hearing, there was an additional outstanding certificate for Hancock County. Appellants insist that the Orange Grove and Hancock certificates be included in the calculation.
*820 ¶ 18. Neither of these hospitals, Orange Grove and Hancock, had obtained a unit. There was no evidence that they would ever obtain a unit. At the time of the hearing, Orange Grove’s CON had been outstanding for seven years, and Orange Grove had never obtained a unit. The testimony revealed that the Department has been consistent in its practice in counting actual, existing units only. This decision may well reflect the Department’s experience that just because a facility gets permission to install an MRI unit does not mean it ever will. The Department’s refusal to count non-existent, non-operational units, was therefore not arbitrary and capricious.
¶ 19. We are nevertheless asked to judge whether the Department’s procedure of counting or Appellants’ procedure is the better method. While either practice seems reasonable, we cannot say the Department erred. The Department, the applicant, and contestants are bound by the numbers as reflected in the State Health Plan in effect at the time of the application. This is because no certificate of need shall be granted unless the proposal “substantially complies with the projection of need as reported, in the state health plan in effect at the time the application for the proposal was submitted.” Miss. Code Ann. § 41-7-193(1) (Rev.2005) (emphasis added). Additionally, the State Health Plan is “the sole and official statewide health plan for Mississippi which identifies priority state health needs.... ” Miss.Code Ann. § 41-7-173(s) (Rev.2005). Regardless of how many units and certificates may have been in existence at the time of the hearing, the State Health Plan in effect at the time of Coastal’s application reflected twelve units operating, with one certificate outstanding. Whether we count this as twelve or as thirteen, there were enough procedures in GHSA-7 to exceed the optimum level set by the Department. This issue has no merit.

II. Did the Department err when it credited Coastal with providing a full range of diagnostic modalities?

¶20. Appellants next argue that there was no evidence that Coastal would provide a full range of diagnostic modalities, and therefore, the CON should not have been granted. Coastal responds that all that is required is that Coastal have these modalities available to its patients, and that Coastal does not need to be the provider.
¶ 21. The State Health Plan states:
An applicant desiring to offer MRI services must document that a full range of diagnostic imaging modalities for verification and complementary studies will be available at the time MRI services begin. These modalities shall include, but not be limited to, computed tomography (full body), ultrasound, angiogra-phy, nuclear medicine, and conventional radiology.
Miss. State Health Plan, FY 2004, at XI-47. Pittman testified that “available” means either through the applicant or some other source. She testified that if a doctor at Coastal had staff privileges at a hospital where a full range was available, this would satisfy the availability criteria.
¶ 22. Dr. Frank Alan Lovell testified that Coastal will provide the open MRI and conventional radiology at its clinic. As for the other services, Coastal’s physicians will use their staff privileges at local area hospitals, Memorial Hospital and Garden Park Hospital in Gulfport, and Hancock Medical Center in Bay St. Louis, which provide a full range of modalities minus the open MRI. With their staff privileges, they are able to order any procedures that they need. Coastal has a contract with Garden Park. As for the other two, Coast *821 al’s physicians are the only radiologists that work at those hospitals.
¶ 23. In response, Appellants’s healthcare planning and financial analysis expert, Dan Sullivan testified:
I mean, to me, that doesn’t really address the criterion because, first of all, radiologists don’t refer patients for procedures. Other doctors do.
You know, if the patient’s being referred for a procedure that — that Coastal doesn’t have, then that doctor basically — I mean, they might say call the hospital and they have it done, but there’s no formal linkage there to make sure that a full range of procedures are available to those patients at the time they present for MRI.
Sullivan was unable to discount the fact that the hospital would accept the referral from Coastal’s physicians. On cross-examination, Sullivan admitted that the Appellants do not provide a full range of diagnostic procedures at their sites either:
Q. And I assume if they have patients that need nuclear medicine services, they have to make those services available at other providers?
A. I think they would probably tell the referring physician, “We don’t offer that here, you need to call someone else.”
Q. Right. And, therefore, make it available someplace else?
A. That’s true.
In other words, Appellants’ expert admitted that to satisfy the “availability” criterion, all that is needed is that the applicant makes sure someone will refer the patient to another facility that provides the other needed modalities. There is nothing to indicate that Coastal could not make use of this tactic of making sure the original referring physician locates a facility that provides the other needed procedures. Furthermore, Coastal has a better ability to directly refer its patients to coast hospitals, as none of Appellants’ doctors have staff privileges at any coast hospitals. This issue has no merit.

III. Did the Department base its decision on faulty financial projections?

¶ 24. Appellants next argue that Coastal’s financial projections were faulty because (1) they were based on the cash accounting basis rather than the accrual accounting basis, (2) Coastal projected to pay their staff barely minimum wage, and (3) the projection was based on a less expensive MRI unit than was later sought.

A. Accrual basis versus cash basis

¶ 25. Another criteria an applicant must satisfy is the economic viability of the proposal. Specifically, the applicant must demonstrate, “[t]he immediate and long-term financial feasibility of the proposal, as well as the probable effect of the proposal on the costs and charges for providing health services by the institution or service. Projections should be reasonable and based upon generally accepted accounting procedures.” Certificate of Need Revieiv Manual at 57 (May 13, 2000).
¶26. Charles Rafferty testified on behalf of Coastal as an expert in financial analysis of medical practices. He testified that he could not tell from Coastal’s financial statement whether the MRI unit was to be leased or purchased. If the unit was to be purchased, then Coastal’s projections did not conform to generally accepted accounting principles (“GAAP”), because the projections did not account for depreciation. If the unit was to be leased, then the projections did conform to the GAAP, because there would be no need to account for depreciation; rather, the monthly rent was expensed accordingly. In rebuttal, *822 Dr. Lovell testified that the projections and application were based on the assumption that the unit would be leased. Rafferty was recalled, and he testified that the projections did conform with GAAP. This issue has no merit.

B. Staff salaries

¶ 27. The only staffing requirements placed on an applicant is that the applicant must document that certain staff will be available — a director and a full-time MRI technologist-radiographer. Miss. State Health Plan, FY 2004. at XI-48. The State Plan does not specify the amount of staff salaries.
¶ 28. Coastal plans on hiring two full-time MRI technologists, a full-time receptionist, and a clerk. Coastal projected employee salaries to be $141,960 the first year, $147,638.40 in year two, and $153,543.94 in year three. Dr. Lovell testified that an MRI technologist makes between $50,000-$60,000 a year. Accepting the lower figure, this leaves $41,960 left in the employee salary budget to pay the two remaining employees. If the receptionist and file clerk were paid equally, they would receive $20,980. This reflects an hourly wage of $10.09. This is well above the minimum wage. Taking the higher tech salary of $60,000, this leaves $21,960 for the receptionist and clerk. Paid equally, each would receive $10,980 per year. This reflects an hourly wage of $5.28, which is still above the minimum wage of $5.15 per hour.
¶ 29. There was later testimony during Dr. Lovell’s cross-examination in which he was asked again to break the compensation down by employee. He said he had not thought about an exact break down, but he would estimate $75,000 for the supervising MRI tech Randy Patterson, $55,000 for the other MRI tech, $20,000 for the receptionist and $10,000 for the clerk. He said the clerk position may be a part-time position. These figures exceed the $141,960 budgeted for salaries in the first year. However, these individual figures were not certain as Coastal had not begun hiring employees. Dr. Lovell stood by the projected salary total, but was unsure of how the individual salaries would breakdown.
¶ 30. We find there was substantial credible evidence to support a finding that Coastal’s employee salary projections were reasonable. This issue has no merit.

C. Subsequent evidence of more expensive equipment

¶ 31. Finally, Appellants seek to attack or impeach the Department’s order by asserting that it was based on Coastal’s “positively misleading” representation as to what equipment it planned to use. Essentially, we are asked to review the credibility of testimony and overturn a factual finding based on faets outside the record that occurred subsequent to appeal.
¶ 32. Coastal’s application and witnesses indicated that the MRI unit it intended to use was a .23 Tesla. The unit cost is $139,156.80 per month. Although Coastal researched other machines, such as a .35 Tesla, Coastal had determined that it was going to use a .23 Tesla machine. Thus, there was substantial credible evidence to support a finding that Coastal’s financial projections were accurate.
¶ 33. On appeal, the Appellants contend that, a month after prevailing in chancery court, Coastal wrote a letter to the Department announcing its intention to substitute a GE Sigma Ovation scanner. The Appellants contend that this was the same unit that Coastal had denied it was considering during the hearing. The Appellants argue that this was a “bait and switch” which makes a new application necessary. In *823 this appeal, we review the December 16, 2004 final order that approved Coastal’s application for a certificate of need. We cannot set this order aside unless there was an error of law, a factual finding that was not supported by substantial credible evidence, the Department exceeded its jurisdiction, or the Department violated any constitutional rights. Miss.Code Ann. § 41 — 7—201 (2)(f) (Rev.2005). We find no such error. By basing its opinion on substantial credible evidence presented at the hearing, the Department transgressed no error of fact or law. This issue has no merit.

TV. Did the Department violate its own rules?

¶ 34. Appellants claim that the Department violated its own rules when it accepted additional affidavits from Coastal on March 10 and again on April 26, even though it had given Coastal the deadline of March 1.
¶ 35. Coastal submitted its application on December 17, 2003. Coastal was not notified until two months later, February 13, that its application was deemed incomplete. This was despite the fact that the rules require the Department to review an application for completeness within fifteen days of receipt. Certificate of Need Review Manual at 27. Among the additional information Coastal was required to submit was additional physician affidavits. The Department’s February 13 letter stated, “Failure to provide the requested information ... by March 1, 2004, shall result in the deferral of your project to a later review cycle. We will notify you within fifteen (15) days of receiving your information as to whether your application is complete.” Indeed, Pittman testified that when late information is received, the review usually gets bumped to the next review cycle. Nevertheless, the Manual provides, “An applicant may submit additional material until the first day of the first month of the review cycle (the day the application is entered into review).” Id. at 28. The Department’s quarterly review cycles begin January 1, April 1, July 1, and October 1. Id. at 30.
[AJffected persons may submit material to the Department at any time during the first 30 days following the date the application is deemed complete. Entry of an application into review shall cause a notice ... to be published ... and ... the public is invited to comment on the application for a period of thirty (30) days....

Id.

¶ 36. Under the rules, Coastal had until the first day of the review cycle, April 1, to submit .additional information. The Department accepted the March 10 affidavits and deemed Coastal’s application complete April 1. This began the thirty-day public comment period. More affidavits were given April 26 and accepted by the Department. Appellants argue that accepting the March 10 and April 26 affidavits violated their rights to notice and a hearing. However, the thirty-day comment period did not start until the application was deemed complete on April 1. So, on April 1, Appellants had notice of the March 10 affidavits and had the ability to comment on Coastal’s application. There were only four days left in the comment period when the April 26 affidavits were submitted. The record is silent as to whether the comment period was extended accordingly.
¶ 37. The staff analysis, which took all these affidavits into account, was publicized and stated, “In accordance with Section 41-7-197(2) ... any person may request a public hearing on this project within 20 days of publication of the staff analysis. The opportunity to request a hearing expires on June 3, 2004.” Appel *824 lants had notice, a pre-hearing discovery period, and their statutorily-guaranteed right to a public hearing on all the information several months later. Miss.Code Ann. § 41-7-197(2) (Rev.2005).
¶ 38. We need not decide if the later public hearing on all the information cured the lack of a full comment period on the April 26 affidavits. Indeed, we may assume that since the statute provides contestants both these rights (public comment period and public hearing), that one may not be substituted for the other. Regardless, the evidence indicated, and Appellants admit, that even discounting the April 26 affidavits, Coastal satisfied its showing of need, i.e., that it would perform at least 1,700 procedures by the end of the second year. This issue has no merit.
¶ 39. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.

. A standard or non-open MRI unit is a barrel-like machine in which the patient is laid on his back within the machine's narrow, tunnel-like opening. The patient is totally encompassed and surrounded by the machine itself. There are natural problems caused by the narrow or confining space of a standard or non-open MRI unit. For example, patients with claustrophobia cannot tolerate the confinement, and obese individuals cannot fit into the narrow opening. Also, a standard or non-open MRI unit is very loud for the patient.
An “open MRI” unit does not enclose the patient. Open MRI units can accommodate claustrophobic and obese patients. Also, open MRI units are able to operate much more quietly during the procedure.

. There was no other provider of open MRI services on the Coast that was qualified to accept both Medicare and Medicaid patients.

. The State Health Plan is "the sole and official statewide health plan for Mississippi which identifies priority state health needs and establishes standards and criteria for health-related activities which require certificate of need review....” Miss.Code Ann. § 41 — V—173(s) (Rev.2005). Section 41-7-185(g) empowers the Department to prepare, review, and revise the State Health Plan. No certificate of need shall be granted unless the proposal "substantially complies with the projection of need as reported in the state health plan in effect at the time the application for the proposal was submitted.” Miss.Code Ann. § 41-7-193(1) (Rev.2005).