CARLTON, J.,
 

 for the Court.
 

 ¶ 1. Connie Radford worked for CCA-Delta Correctional Facility (DCF) from September 1996 until allegedly being unable to work after May 17, 2005, due to mental trauma suffered on the job. Rad-ford claims that her mental trauma resulted from the ill treatment she received at work. On September 11, 2000, Radford filed a petition to controvert with the Mississippi Workers’ Compensation Commission (Commission) alleging that she suffered her mental injury from work on or about February 10, 2000.
 

 ¶ 2. A hearing was held on the matter in November 2004 and in January 2005. On April 27, 2005, the administrative law judge awarded Radford temporary total disability benefits from June 9, 2000, to the
 
 *1160
 
 present. DCF appealed to the Commission on May 17, 2005. On January 11, 2006, the Commission reversed the order of the administrative law judge finding that her decision was not supported by substantial evidence. Radford appealed the Commission’s decision to the Circuit Court of Leflore County on January 19, 2006. The circuit court affirmed the Commission’s decision on September 12, 2007. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. Radford was initially hired at DCF as a records clerk and was later promoted to the job of records supervisor, which is the job she held relevant to this claim. Radford received favorable performance evaluations from 1997 through 2000. Rad-ford’s husband, Donald Radford, also worked for DCF as the chief of security. At the start of Radford’s employment, she was supervised by Deputy Warden Don Grant.
 

 ¶ 4. Grant was eventually promoted to the position of chief warden. After Grant was promoted, Donald was appointed to the position of acting deputy warden, filling the position vacated by Grant. Upon appointing Donald to the new position, Grant determined it would be best for Radford to continue to report to him, instead of reporting to her husband. Donald later applied for permanent appointment as deputy warden, but he was denied the position. The position was eventually given to Deputy Warden Jackie Banks in September 1998 based on her previous employment as a warden at a Corrections Corporation of America (CCA) prison facility in Texas.
 

 ¶ 5. From them employment relationship, the Radfords, Grant, and Grant’s wife formed a friendly and close relationship. Both Radford and Grant testified that Radford often helped take care of Grant’s wife as she was sick with lupus. From the record, it appears this allegedly caused some friction among other employees at DCF as it was noted that Radford was being paid by DCF when she went to help Grant’s wife or to run other errands for the Grants. Radford testified that although Grant initially did not require her to use her leave time when she left to help Grant and his wife, she later told him that if this was causing problems at DCF that she would use her leave time. She testified that Grant later required her to use her leave time.
 

 ¶ 6. Radford alleges that when Banks’s temporary position as assistant became permanent,
 
 [1]
 
 that Banks began making disparaging remarks about her to other employees and harassed and ridiculed her in front of the other employees. Radford also claims that Banks was jealous of the friendship she and her husband had with Grant. Radford claims that although she went to Grant several times about the way Banks treated her, he did nothing to intervene and advised her to stay out of Banks’s way. Radford claims that Banks’s conduct caused her to suffer post-traumat-ie stress disorder and severe depression.
 

 ¶ 7. Radford continued to report to Grant after Banks’s arrival. When Grant was out of the office, Banks would fill in during his absence. On May 10, 2000, what has been termed as the “fax incident” occurred in which some papers had not been properly processed in the records department. On that date, Banks was in
 
 *1161
 
 charge of the facility as Grant was out of the office. Radford and her assistant, Cassandra Swims, went to Banks about the mistake.
 

 ¶ 8. Radford contended that the mistake was Swims’s fault. In response, Swims told Banks that neither she nor Radford were to go into the room where the faxes came in; instead, they were to wait to have them delivered to them. Swims claimed that the particular fax in question had not been delivered to her for processing. According to several witnesses, a shouting match occurred between Radford and Banks. Banks told Radford and Swims that she was acting chief warden while Grant was out of the office and that neither Swims nor Radford were to check the fax machine. Radford allegedly argued that this was not how Grant would have handled the situation and that she was not required to take orders from Banks. Later that day when Grant called the prison to see how things were going, the incident was reported to him. Grant advised that he would handle the situation upon his return to the prison.
 

 ¶ 9. When Grant returned to work on May 11, 2000, he, Radford, and Banks met to discuss the “fax incident.” According to both Grant and Banks, Radford did most of the talking, and the meeting eventually broke down with no resolution. After the meeting, Radford was visibly upset and went back to her office where she stayed a short time. Radford then went to Grant and Warden Phillip McLaurin and told them she was going home. Radford testified that she was upset because she felt betrayed by Grant, who in her view had taken sides with Banks over her.
 

 ¶ 10. Radford went to her general physician, Dr. David Ball, on May 15, 2000, for medical treatment. In fact, according to the evidence presented in this case, before Radford was employed by DCF in 1996, she had endured an abusive childhood, a bankruptcy, and a host of other medical and psychiatric problems. However, Rad-ford testified that she sought medical treatment on May 15, 2000, for the following reasons: “I was experiencing low self-esteem to myself, that I wasn’t performing my job duty, that I [thought] I was. Grant always praised me, that everything I did [sic] and then it changed, just all of a sudden it changed.” Dr. Ball noted on his patient sheet that Radford was suffering “job stress,” and he noted that he advised Radford to seek legal assistance for her issues at work.
 

 ¶ 11. Additionally, according to the medical records provided by Dr. Ball, Rad-ford also visited Dr. Ball on February 10, 2000, and March 3, 2000, for “situational stress” and was prescribed medication on both visits. However, Dr. Ball did not note on either of the patient sheets from the February 2000 or the March 2000 office visit that Radford mentioned any type of job-related stress.
 

 ¶ 12. Upon Radford’s return to work, on May 15, 2000, Grant determined that Radford should begin reporting directly to McLaurin. On May 16, 2000, Grant issued a memo to all staff noting the change in command of the records department. Grant based this decision on his belief that his friendship with the Radfords compromised his ability to be an effective leader because of the perceived favoritism that he showed the Radfords.
 

 ¶ 13. Radford testified that she felt “devastated” by this change in command. She further testified that she felt “crushed” and felt like Grant had “thrown her away” by making her work under McLaurin. As a result, Radford decided to fill out a grievance form regarding Banks. However, the grievance form was not filed until June 7, 2000. On May 17,
 
 *1162
 
 2000,
 
 [2]
 
 Radford left work and has not attempted to work at DCF or elsewhere since that day. According to Radford’s medical records, on May 24, 2000, Dr. Ball filled out paperwork for disability due to situational stress.
 

 ¶ 14. On June 7, 2000, Radford again visited Dr. Ball, and he referred her to Dr. Melvyn Levitch for psychiatric care. Dr. Levitch saw Radford on June 9, 2000, upon Dr. Ball’s referral. He prescribed her some medication. He saw her again in July 2000; she reported to Dr. Levitch that her husband had recently suffered a heart attack and was in the hospital. In August 2000, Dr. Levitch admitted Rad-ford to the hospital for psychiatric care. Dr. Levitch testified that he diagnosed Radford with post-traumatic stress disorder (PTSD). When asked what he thought had caused Radford to suffer from PTSD, Dr. Levitch replied: “I think the trauma at work is what did it.... ”
 

 ¶ 15. In contrast to Dr. Levitch’s diagnosis, Dr. Mark Webb, who performed an independent medical evaluation of Radford for DCF, concluded the following in his medical report as to Radford’s medical condition:
 

 [Radford] is suffering from dysthymia and histrionic personality traits. Both of these illnesses date back to her childhood. Neither of these are disabling nor were they prolonged or exacerbated by her employment. Her difficulty at work was that she was not able to get along with some people at work due to her pre-existing, maladaptive personality traits. Also, there are a lot of other stressors going on in [Radford’s] life such as financial [difficulty] and difficulty with her daughter’s husband. She got so mad at one point that she wanted to kill her daughter’s husband. [Rad-ford] should continue treatment with Dr. Levitch; however, it is not work-related. [Radford’s] employment at [DCF] did not cause any psychiatric injury or illness nor did it prolong or exacerbate her pre-existing psychiatric illnesses.
 

 ¶ 16. Additionally, Dr. Judith Lyons, a clinical psychologist, testified on behalf of DCF at the hearing before the administrative law judge. She testified that it was her opinion that Radford suffered from a borderline disorder which has been defined as a personality disorder marked by a long-standing pattern of instability in interpersonal relationships, behavior, mood, and self image that can interfere with social or occupational functioning or cause extreme emotional distress. Dr. Lyons stated that children often develop borderline personality disorders when living through the type of abuse that Radford experienced as a child. Dr. Lyons concluded that it was her opinion that Rad-ford’s mental condition was not caused by her employment at DCF or by the related incidents involving Banks.
 

 ¶ 17. Judge Tammy Hartcock, the administrative law judge, entered an order on April 27, 2005, finding that Radford had met her burden of proof in showing that her mental claim was work related and awarded Radford temporary total disability benefits from June 9, 2000, to the present. DCF appealed to the Commission on May 17, 2005. On January 11, 2006, the Commission reversed the order of the administrative law judge after having found that Radford, “who unquestionably has psychiatric problems which demand medical attention,” had failed to meet “her burden of proving by clear and convincing evidence that she was subjected to extraordinary incidents of her employment with [DCF] which caused, contributed to, or aggravated her mental condition.”
 
 *1163
 
 Radford appealed the Commission’s decision to the Circuit Court of Leflore County on January 19, 2006.
 

 ¶ 18. The circuit court affirmed the Commission on September 12, 2007. The circuit court held as follows:
 

 It is clear from the facts of this case that the decision of the Commission was supported by substantial evidence, was not clearly erroneous, and was not contrary to the overwhelming weight of the evidence. It is also clear that [Radford] failed to show by clear and convincing evidence that her mental or psychological injury was caused by something more than the ordinary incidents of her employment.
 

 ¶ 19. Although Radford lists six issues in her statement of the issues, she only addresses two of those issues in her brief, which include the following: (1) whether she suffered a work-related injury from which she is totally disabled, and (2) whether the Commission arbitrarily failed to consider her treating physician’s testimony and opinion, as well as the opinion and testimony of Dr. Lyons.
 

 STANDARD OF REVIEW
 

 ¶ 20. In workers’ compensation cases, the Commission is the trier of fact, and its judgment may only be reversed if we find that its decision was “clearly erroneous and contrary to the overwhelming weight of the evidence.”
 
 McElveen v. Croft Metals, Inc.,
 
 915 So.2d 14, 19(10) (Miss.Ct.App.2005) (quoting
 
 Smith v. City of Jackson,
 
 792 So.2d 835, 337(7) (Miss.Ct. App.2001)). “The Commission is free to accept or reject the [administrative law judge’s] findings, so long as the Commission’s [decision] [is] based [upon] substantial evidence.”
 
 Natchez Equip. Co. v. Gibbs,
 
 623 So.2d 270, 273 (Miss.1993) (citation omitted). In a workers’ compensation case involving a physical work-related injury, the claimant is held to a “fair preponderance of the evidence standard.”
 
 Hosp. Housekeeping Sys. v. Townsend,
 
 993 So.2d 418, 423(19) (Miss.Ct.App.2008) (citing
 
 Hedge v. Leggett & Platt, Inc.,
 
 641 So.2d 9, 13 (Miss.1994)).
 

 ¶ 21. “However, when the claimant seeks benefits as a result of a compen-sable mental injury, the burden of proof is raised to clear and convincing evidence of a causal connection between the injury and employment.”
 
 Id.
 
 (citing
 
 Fought v. Stuart C. Irby Co.,
 
 523 So.2d 314, 317 (Miss. 1988)). “An appellate court may not reweigh the evidence and substitute its decision for that of the Commission.”
 
 Stewart v. Singing River Hosp. Sys.,
 
 928 So.2d 176, 180(18) (Miss.Ct.App.2005). Errors of law are reviewed de novo.
 
 McElveen,
 
 915 So.2d at 19(10) (citation omitted).
 

 I. WHETHER RADFORD SUFFERED A WORK-RELATED INJURY FROM WHICH SHE IS TOTALLY DISABLED.
 

 ¶ 22. To recover benefits for a mental injury, Radford had the burden to prove by clear and convincing evidence that she suffered from a disabling mental injury which was either caused, contributed to, or aggravated by some unusual occurrence or untoward event in her employment with DCF.
 
 See Fought,
 
 523 So.2d at 317 (citations omitted). Radford had to 'show something more than the ordinary incidents of employment had occurred.
 
 See id.
 
 (citations omitted). Stated differently, “our law does not compensate disability attendant upon the general stress or normal human wear and tear of the workplace.”
 
 Smith v. City of Jackson,
 
 792 So.2d 335, 338(9) (Miss.Ct.App.2001) (citation omitted).
 

 ¶ 23. Radford asserts that based on Mississippi case law, the Commission should have affirmed the administrative
 
 *1164
 
 law judge’s order and found her claim to be a compensable mental injury. Radford cites several cases where the claimant prevailed in receiving workers’ compensation benefits. Radford refers to
 
 Mid-Delta Home Health, Inc. v. Robertson,
 
 749 So.2d 379 (Miss.Ct.App.1999) (holding that factors. such as increased workload, derisive comments by supervisor, and increasingly demanding, thoughtless, and, insensitive supervisor was a compensable mental injury) and
 
 Kemper National Insurance Co. v. Coleman,
 
 812 So.2d 1119 (Miss.Ct.App. 2002) (holding that increased workload in an attempt by supervisor to terminate a claimant’s employment was an untoward event/unusual occurrence).
 

 ¶ 24. However, the case Radford cites that we find to be most on point is
 
 Borden, Inc. v. Eskridge,
 
 604 So.2d 1071 (Miss. 1991). In
 
 Eskridge,
 
 the court found the following:
 

 There is substantial credible evidence to support the Commission’s findings, and we are not persuaded by Borden’s argument to the contrary. Dr. Levitch, a reputable board certified psychiatrist who treated Eskridge for over two years, testified that Eskridge was psychologically disabled and his work played a significant part in causing it. Testimony from Eskridge and his wife, corroborated in part by fellow employees, established a protracted pattern by Kinard [Eskridge’s supervisor] to put pressure and stress upon Eskridge....
 
 In fairness, we add that there was substantial credible evidence to support the opposite conclusion.
 
 Unfortunately for Borden, the Commission as [fact-finder], as in
 
 Brown & Root Constr. Co. v. Duckworth,
 
 475 So.2d 813 (Miss.1985), found a compensable mental disability, and under our standard of appellate review, we are not at liberty to reverse this finding. The Commission obviously found, contrary to its finding in
 
 Fought,
 
 523 So.2d at 318, that stresses to which Eskridge was subjected were “more than the ordinary incidents of employment,” and were “untoward events or unusual occurrences” culminating in his blackout on January 28, 1983, and subsequent disability.
 

 Eskridge,
 
 604 So.2d at 1074 (emphasis added).
 

 ¶25. In the case at bar, the administrative law judge found that Radford had suffered a compensable mental injury arising from her employment with DCF. However, the Commission reversed the administrative law judge’s decision. The Commission stated that they could not conclude “that any of the alleged precipitating events relied upon by [Radford], whether considered alone or in concert, should be characterized as extraordinary incidents of her employment.” The Commission found that the realignment of command by Grant which Radford found to be so devastating “can hardly be characterized as extraordinary.”
 

 ¶ 26. Additionally, the Commission found that “there is an abundance of credible evidence which shows [Banks] did not treat [Radford] unfairly or demean or abuse her in any way.” We do not deny that there existed testimony supporting Radford’s allegations that Banks had yelled at Radford and perhaps even been rude to her. However, the Commission, as fact-finder, found that Radford had not established by clear and convincing evidence that Banks subjected Radford to “a series of untoward and extraordinary employment related events.”
 

 ¶ 27. As was stated in
 
 Eskridge,
 
 even if there had been. substantial evidence to support the opposite conclusion reached by the Commission regarding Banks’s behavior toward Radford — which we do not find in this case — under our standard of appel
 
 *1165
 
 late review, we are not at liberty to reverse the Commission’s findings when supported by substantial evidence.
 
 See id.
 
 Therefore, we find this issue has no merit.
 

 II. WHETHER THE COMMISSION ARBITRARILY FAILED TO CONSIDER RADFORD’S TREATING PHYSICIAN’S TESTIMONY AND OPINION AS WELL AS THE OPINION AND TESTIMONY OF DR. LYONS.
 

 ¶ 28. In determining that Rad-ford’s employment with DCF did not cause her any mental injury, the Commission had before it the conflicting testimonies and opinions of three physicians. Radford alleges that the Commission committed prejudicial error when it “erroneously gave controlling weight to the medical opinion of the Employer/Carrier’s expert, [Dr. Webb], who only saw her one time, and only at the request of the Employer/Carrier.” We disagree.
 

 ¶ 29. Radford largely relies in part on
 
 Stewart,
 
 928 So.2d at 183-84(36), to support her above proposition. In
 
 Stewart,
 
 the Court wrote: “In
 
 Johnson v. Ferguson,
 
 435 So.2d 1191, 1193-95 (Miss.1983), the Mississippi Supreme Court held that the decision of the Commission was against the overwhelming weight of the evidence when it disregarded the testimony of the claimant’s treating physician and instead relied on the employer’s expert.”
 
 Id.
 
 In explaining its holding, the Court stated:
 

 Consistent with case law, we find that the Commission incorrectly relied on the opinion of Dr. McCloskey, who clearly stated that he could offer no opinion on Stewart’s present condition and who had not treated her for more than two years prior to his testimony, and on the opinion of Dr. Terry Smith who reviewed some of Stewart’s medical records for purposes of testifying for the employer/carrier.
 

 Id.
 
 at 184(37).
 

 ¶30. Unlike the
 
 Steimrt
 
 case, we do not have a situation here where a physician has clearly stated that he or she could not offer any opinion on Radford’s condition, nor do we have a situation where an expert has reached an opinion by merely reviewing some of Radford’s medical records. Radford’s psychiatrist, Dr. Levitch, diagnosed Radford with PTSD. Dr. Webb, after reviewing all of Radford’s medical records and meeting with her personally in order to make an independent medical evaluation on behalf of DCF, found that Radford suffered from dysthymia and histrionic personality traits that dated back to her traumatic childhood. Dr. Lyons, who also testified on behalf of DCF, based her expert opinion on the records of Drs. Ball and Webb and the hearing testimony in front of the administrative law judge. Dr. Lyons opined that Radford suffered from a borderline personality disorder that was not caused by her employment with DCF, but related back to her childhood.
 

 ¶ 31. We find
 
 Sibley v. Unifirst Bank for Savings ex. rel. Resolution Trust Corp.,
 
 699 So.2d 1214, 1219 (25-26) (Miss. 1997) to be markedly similar to the case at bar and on point regarding Radford’s contentions of error. In
 
 Sibley,
 
 the court held the following:
 

 As to Sibley’s contention that the Commission should not have relied upon the testimony of Dr. Lyons because she had not examined Sibley, but testified based upon her evaluation of Sibley’s medical and psychiatric records and observation of the trial, discussion of several points is in order. Sibley relies upon
 
 Johnson v. Ferguson,
 
 435 So.2d 1191 (Miss. 1983), to support her contention that the Commission erred in relying upon the testimony of Dr. Lyons rather than
 
 *1166
 
 that of her treating physicians, Dr. Wheatley and Dr. Guild, and the social worker, Sue Meng.
 
 Johnson
 
 is distinguishable from the case sub judice in' that it involves an [administrative law judge] who relied upon the expert testimony of a doctor who did not perform a myelogram even though the physician admitted that such a test was the sole diagnostic tool available to rule out the possibility of a herniated disc.
 
 Id.
 
 at 1195. This Court held that when an expert’s testimony is based upon an inadequate or incomplete examination, the expert’s opinion does not carry as much weight when compared to an expert that has made a thorough and complete examination.
 
 Id.
 

 Our rules of evidence state that “the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before a hear-, ing.” M.R.E. 703. In the case sub judi-ce, Dr. Lyons based her opinion upon her observation of Sibley in the hearing and upon the medical and psychiatric-records of her treating physicians. The evidence was properly admitted; the only issue to be resolved was the weight to be given to the testimony, a responsibility given to the Commission.
 

 Id.
 

 ¶32. The Commission pointed out all three varying diagnoses of the three physicians in its order in stating that: “Radford had been diagnosed with PTSD, dysthy-mia, histrionic personality, and borderline personality.” The testimony of Drs. Webb and Lyons supported the Commission’s order. Their testimony conflicted with Dr. Levitch’s testimony. It was for the Commission to weigh the credibility of the expert testimony, and it found the testimony of Drs. Webb and Lyons more credible.
 
 See Hardaway Co. v. Bradley,
 
 887 So.2d 793, 795-96(12) (Miss.2004) (stating that when examining conflicting opinions by medical experts, “we will not determine where the preponderance of the evidence lies ... the assumption being that the Commission as trier of fact, has previously determined which evidence is credible, has weight, and which is not”) (quoting
 
 Baugh v. Cent. Miss. Planning and Dev. Dist.,
 
 740 So.2d 342, 344(8) (Miss.Ct.App.1999)).
 

 ¶ 33. Moreover, the Commission stated that although Radford “unquestionably has psychiatric problems which demand medical attention, [Radford had failed to prove] by clear and convincing evidence that she was subjected to extraordinary incidents of her employment with DCF which caused, contributed to, or aggravated her medical condition.” Because we find that the Commissions’ decision was supported by substantial evidence, we find that this issue has no merit.
 
 See McElveen,
 
 915 So.2d at 19(10).
 

 ¶ 34. THE JUDGMENT OF THE LE-FLORE COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.
 

 [1]
 

 . It is not clear from the record when exactly Radford claims that Banks began treating her badly. However, based upon the date of February 10, 2000, listed in her petition to controvert her disability, we assume that Banks's allegedly began harassing Radford on or about this date.
 

 [2]
 

 . Wage records indicate Radford’s last day of work was May 20, 2000.