ROBERTS, J.,
for the Court:
¶ 1. Parnell Harris filed a claim for workers’ compensation benefits against Scott Colson’s Shop, Inc. (SCSI). Harris claimed he became totally and permanently disabled as a result of being mistreated while he was employed at SCSI. The administrative judge (AJ) who initially heard Harris’s claim awarded Harris full compensation benefits. SCSI appealed to the full Mississippi Workers’ Compensation Commission (Commission). The Commission reversed the AJ’s decision. Harris then appealed to the Hinds County Circuit Court. The circuit court reversed the Commission’s decision and awarded full compensation benefits. Aggrieved, SCSI appeals and asserts that: (1) the Commission did not err when it considered hearsay evidence that the AJ refused to consider; (2) the circuit court improperly substituted its judgment for the Commission’s; and (3) the Commission properly found that Harris was not entitled to workers’ compensation benefits. After careful consideration, we find that the circuit court erred when it reversed the judgment of the fact-finder, the Commission. Accordingly, we reverse the judgment of the circuit court and reinstate the Commission’s order finding that Harris is *843 not entitled to workers’ compensation benefits.
FACTS AND PROCEDURAL HISTORY
¶ 2. In December 1998, Harris began making horseshoes in SCSI’s blacksmith shop in Hinds County, Mississippi. According to Harris, who was approximately thirty years old at that time, his supervisor, Alex McGowan, began harassing him on his second day of work. Harris later claimed that McGowan was verbally abusive. Harris further claimed that McGowan had barbeques at SCSI’s facility and that he only invited white employees. Harris also complained that McGowan was outwardly critical of prominent African Americans.
¶ 3. Harris claimed that McGowan used offensive racial slurs while relating a story about an African American man’s penis being shot off. McGowan did not relate the story directly to Harris, but Harris was present while McGowan told the story.
¶ 4. On one other occasion, approximately six months later, McGowan told a story to Harris and Tony McKay, another African American employee at SCSI. McGowan’s story involved explaining how someone else had used a racial slur. In other words, McGowan repeated a racial slur that someone else had used in the past. Harris became so upset that he clocked out and went home.
¶ 5. Mark Clay bought SCSI from Scott Colson while Harris worked at SCSI. Clay learned about Harris’s leaving work due to McGowan’s story. Clay called Harris and convinced him to return to work the next morning so McGowan could apologize. However, McGowan did not appear the next morning. Clay apologized on McGowan’s behalf. McGowan arrived at work at approximately 10:00 a.m. It is disputed whether McGowan apologized later. In any event, Harris became upset and left work at approximately 12:00 p.m. He never returned to work.
¶6. Over time, Harris became increasingly paranoid. His mental condition became debilitating. Therapy notes from treating physicians note that the incidents at SCSI figured heavily into Harris’s mental state. Essentially, Harris had become fearful and upset. He directly related his feelings to his experiences while working at SCSI. According to Harris, he was afraid that McGowan or Colson, the owner of SCSI for the majority of the time that Harris worked there, would try to kill him. Harris’s fear was based on an imaginary threat to Harris’s life by McGowan and/or Colson.
¶ 7. By the time of the hearing before the AJ, approximately seven years after Harris had quit his job at SCSI, Harris was completely disabled as a result of his mental condition. Dr. Wood Hiatt, a board-certified psychiatrist, examined Harris on behalf of SCSI. Dr. Hiatt opined that Harris suffered from severe, chronic paranoid schizophrenia. Two of Harris’s three treating physicians had expressed the same diagnosis. Although Harris’s treating physicians never provided an explicit explanation of what caused Harris’s schizophrenia, Dr. Hiatt stated that paranoid schizophrenia normally develops during late adolescence or early adulthood. Dr. Hiatt did not believe that Harris’s experiences at SCSI could have caused Harris’s schizophrenia.
¶ 8. On June 9, 2000, Harris filed a petition to controvert. On January 22, 2007, the AJ issued his opinion, finding that Harris was entitled to workers’ compensation benefits. SCSI appealed the AJ’s opinion to the Commission. On December 5, 2007, the Commission made its findings and legal conclusions effectively *844 overruling the AJ’s opinion. Harris appealed to the circuit court. On December 28, 2009, the circuit court issued its opinion and order reversing the Commission’s decision and awarding full compensation benefits. SCSI appeals.
STANDARD OF REVIEW
¶ 9. The Mississippi Supreme Court has held:
The standard of review in workers’ compensation cases is limited. The substantial evidence test is used. See Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1245-47 (Miss.1991). The Workers’ Compensation Commission is the trier and finder of facts in a compensation claim. [An appellate court] will overturn the Workers’ Compensation Commission decision only for an error of law or an unsupported finding of fact. Georgia Pac. Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991). Reversal is proper only when a Commission's] order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law. Smith v. Jackson Constr. Co., 607 So.2d 1119, 1124 (Miss.1992).
Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778 (¶ 6) (Miss.2003). Furthermore, as is always the case, questions of law receive a de novo review. Short v. Wilson Meat House, LLC, 36 So.3d 1247, 1251(23) (Miss.2010).
¶ 10. Furthermore, “[w]hen an appeal is resolved by the Commission, the administrative judge’s decision become[s] moot.” Kitchens v. Jerry Vowell Logging, 874 So.2d 456, 462 (¶ 16) (Miss.Ct.App.2004). “The administrative judge is not an independent arbiter entitled to deferential review by the Commission, as a trial judge is independent of her reviewing appellate court.” Id. at (¶ 18). “There may be substantial evidence to support the administrative judge’s findings, but so long as there also is substantial evidence to support the Commission’s contrary findings, the latter will be upheld.” Id. at (¶ 17) (citing Day-Brite Lighting v. Cummings, 419 So.2d 211, 213 (Miss.1982)).
ANALYSIS
I. HEARSAY EVIDENCE
¶ 11. This contention of error concerns whether the Commission improperly considered hearsay evidence in the form of an affidavit by Jimmy Hudson, who was McKay’s stepfather and Harris’s co-worker at SCSI. Prior to the hearing before the Commission, Hudson was diagnosed with terminal cancer and subsequently had passed away. Hudson’s affidavit averred that Harris had exhibited odd behavior, such as talking to himself. Hudson’s affidavit also averred that Hudson had never heard any racial slurs at work. Furthermore, Hudson’s affidavit averred that he had never found the work environment at SCSI to be “racially hostile.” Hudson’s affidavit closed by stating that Hudson was “an African-American male.”
¶ 12. Under the Commission’s procedural rules, the rules of evidence are relaxed during the Commission’s proceedings. See Short, 36 So.3d at 1255 (¶ 36). Therefore, the Commission was entitled to use and consider Hudson’s affidavit during its deliberations. We note, however, that the information contained in Hudson’s affidavit is not dispositive of Harris’s claims or Harris’s condition. Regardless, the circuit court erred when it found that the Commission erred in considering Hudson’s affidavit.
II. THE COMMISSION’S DECISION
¶ 13. SCSI’s second and third issues both address whether the Commission correctly denied Harris’s claim for *845 workers’ compensation benefits. SCSI .contends that the Commission ruled correctly; therefore, the circuit court erred in overruling the Commission’s decision. We agree.
¶ 14. It is necessary to distinguish two distinctly separate but often confused concepts: causation of Harris’s schizophrenia and the aggravation or exacerbation of a pre-existing mental condition. The record contains absolutely no evidence that Harris had been diagnosed with a mental illness at any time prior to or during his employment at SCSI. Harris presented no testimony whatsoever that, prior to his walking out on the job in June 1999, he had been diagnosed with or received treatment for a mental condition. In other words, prior to his being hired in December 1998, there is no evidence that Harris had a history of mental illness. Accordingly, there is no evidence that Harris had a pre-existing condition that was aggravated or exacerbated by his employment at SCSI. In fact, after Harris quit working for SCSI in June 1999, he successfully applied for unemployment benefits. As noted by the Commission, in so doing, Harris “stated in his application that he was capable of full-time employment. In fact, when specifically asked[,] ‘Is there any reason you cannot accept full-time work,’ the Claimant responded by cheeking ‘no.’ ” Four months later, Dr. Mark Lad-ner first diagnosed Harris with depression and possible post-traumatic-stress disorder. Seventeen months after Harris had walked out at SCSI, Dr. Mario Pineda then diagnosed Harris with schizophrenia. In November 2002, Dr. Pineda concluded that Harris was suffering from chronic schizophrenia. There is simply no evidence that Harris was suffering from schizophrenia before or during the time that he worked for SCSI.
¶ 15. The real issue in this case is one of causation. In reversing the Commission’s decision, the circuit court held that the Commission “did not give proper weight to the testimony of [Harris’s] treating physician, Dr. Ladner, and gave too much weight to the testimony of [SCSI’s] expert, Dr. Hiatt.” The circuit court did not specify any of Dr. Ladner’s testimony that the Commission supposedly failed to weigh properly. Nonetheless, the circuit court went on to hold that: “having made an objective review of the record ... the decision of the [Commission] was not supported by substantial evidence and [was,] therefore[,] arbitrary and capricious.”
¶ 16. Harris claimed that a racially hostile environment at SCSI caused him to develop paranoid schizophrenia. It is necessary to note that it was highly disputed that there was actually a racially hostile environment at SCSI. The Commission’s decision specifically stated as follows:
The Claimant, ... Harris, was hired by Mr. Scott Colson in December ... 1998. The Claimant was hired to make horseshoes in the Employer’s blacksmith shop. According to the Claimant, he was harassed, discriminated against, his civil rights were violated and he was physically abused, by his then supervisor Alex (a.k.a.“Donnie”) McGowin.[1] Mr. Harris claims that Mr. McGowin cursed and screamed at him, pushed him on one occasion while he was making horseshoes, and used racial slurs, specifically the “n-word” in his presence. With regard to the use of the “n-word,” Claimant has alleged that he can recall only two specific incidences where the word was used, and in both instances, *846 the “n-word” was used only in stories that Mr. McGowin was telling about other individuals.
In the first incident, Mr. McGowin was not speaking to the Claimant but to another employee, John Bingham, and the Claimant overheard Mr. McGowin use the “n-word.” In the second incident, Mr. McGowin was telling Claimant and another African-American employee, Tony McKay, a story that a relative told him. At no time, did Mr. McGowin call the Claimant himself the “n-word.” According to the Claimant, after the second incident, he left work early but, thereafter, returned to work at his usual time of 7:00 a.m. the next day. Claimant also claims that on the following day, June 9, 1999, Mr. McGowin told him he did not feel an apology was warranted. Mr. McGowin supposedly made this statement in front of both Tony McKay and Jimmy Hudson. As a result, Claimant stated he once again left work early and, thereafter, did not return.
Tony McKay and Jimmy Hudson worked with the Claimant shoeing horses and were also supervised by Mr. McGowin. Both Mr. McKay and Mr. Hudson are, coincidentally, African-Americans and deny ever witnessing any of the alleged conditions or behavior by Mr. McGowin. In fact, Tony McKay testified as follows:
Q. What type of relationship did [Harris] and Mr. McGowin have?
A. A supervisor and employee relationship.
Q. You don’t recall anything else?
A. No.
Q. Did they get along?
A. As far as I know.
With regard to Mr. McGowin’s alleged use of the “n-word,” Mr. McKay testified that he was only aware of its use while Mr. McGowin was telling a story about his relatives. Mr. McKay further testified that Mr. McGowin apologized both before and after telling the story:
Q. Before Mr. McGowin told the story in the breakroom, did he say anything to the people who were present?
A. Yes, he apologized, first of all, in the beginning and in the end, you know, if it offended anybody.
Q. What did he say in particular?
A. “I ain’t trying to sound racist or nothing.” Something like that. “I hope what I’ve said don’t offend anybody because this is something that happened in the past.”
In stark contrast to the Claimant’s testimony, Mr. McKay testified that Mr. McGowin did, in fact, apologize to the Claimant:
A. Yes, I heard the apology several times from Donnie.
Q. You heard it several times?
A. Yes. Not only has he apologized to [Harris], but he apologized to me and Jimmy also.
Q. He apologized to you and Jimmy and [Harris]?
A. Yes.
Q. Was [Harris] present when he apologized to you all?
A. No, madam.
Q. So, he apologized to you all separately from [Harris]?
A. Uh-uh (indicating yes).
Q. But you were present when he apologized to [Harris]?
A. Yes.
Moreover, Tony McKay testified that he was not offended by Mr. McGowin’s story as it was merely involving a story about people in the past.
Jimmy Hudson was Mr. McKay’s step-father. Prior to the trial, Mr. Hud *847 son was diagnosed with terminal throat cancer. In a[f]ederal discrimination lawsuit involving the same parties and same incidents, Mr. Hudson submitted certain affidavit testimony providing that in his ten plus years of employment with [SCSI], he did not find the working environment to be racially hostile.[2] Moreover, Mr. Hudson, who worked side by side with the Claimant, stated Claimant “appeared to have some sort of psychiatric or emotional condition, as he talked to himself frequently.”
Mark Clay and Scott Colson also dispute the Claimant’s allegations. However, Mr. Clay and Mr. Colson, like Tony McKay, did admit that McGowan did on occasion use curse words and profanity but they were never directed to any one person. Similarly, at no time did they ever witness Mr. McGowin directing the “n-word” at any specific person. In fact, Mark Clay testified as follows:
Q. Now when did you see Mr. Col-son that day? Not Mr. Colson. I’m sorry. Mr. McGowin?
A. Probably an hour later.
Q. What happened when you saw him?
A. I got [Harris] in the break room and Mr. McGowin apologized.
Q. You were present when Mr.— what did Mr. McGowin say?
A. He said, I’m sorry if what I said, you know, offended you. He said, I’m sorry. It was not directed at you. McGowan himself admits using pro-
fanity and having a “dirty mouth” but clearly states that he never directs his curse words to any one person and it is done around both whites and blacks. He denies ever yelling or cursing at Mr. Harris. The allegation that Mr. Harris makes about McGowan popping his hand and pushing him is strongly denied by Mr. McGowan. McGowan admits to grabbing a tool from Harrises] hand and stepping in between him and a machine in an effort to protect him from harming himself, but he classifies this as an attempt to save his life or prevent injury.
With regard to the incident that occurred on or about June 9, 1999, this involved a story told by Mr. McGowan about his grandfather and the use of the word “[-.]” Mr. McGowan admits that he told the story and the word was used but it was not directed at any one person. He states that he just repeated something someone else said in telling the story. In addition, McGowan states that prior to telling the story, he apologized to Harris and Tony McKay, that he was not intending to offend anyone but he would tell the story as it was told to him. He also apologized after telling the story concerning the use of the word “[-.]” In addition, McGowan states that the day after the story he apologized again to Harris for using the word “[-,]” and that Harris seemed to accept the apology and not be bothered by it.
The first time that the Claimant sought medical treatment for his medical condition was October 19, 1999, more than [four] months after the alleged incident. During these four months, the Claimant also received unemployment compensation benefits from the Mississippi Department of Employment Security. Notably, in order to receive such unemployment benefits the Claimant stated in his application that he was capable of full-time employment. In *848 fact, when specifically asked[,] “Is there any reason you cannot accept full-time work,” the Claimant responded by checking “no.”
¶ 17. In reversing the Commission’s decision, the circuit court held that the Commission “did not give proper weight to the testimony of [Harris’s] treating physician, Dr. Ladner, and gave too much weight to the testimony of [SCSI’s] expert, Dr. Hiatt.” The circuit court did not specify any of Dr. Ladner’s testimony that the Commission supposedly failed to weigh properly. Nonetheless, the circuit court went on to hold that: “having made an objective review of the record ... the decision of the [Commission] was not supported by substantial evidence and [was,] therefore[,] arbitrary and capricious.”
¶ 18. As stated above, the Commission is the trier and finder of facts in a compensation claim. Weatherspoon, 853 So.2d at 778 (¶ 6). The circuit court may have opted to weigh certain evidence differently than the Commission, but objectively weighing the evidence was not a proper component of the circuit court’s review as an appellate court. The fact of the matter was that the Commission’s decision was supported by substantial evidence. An appellate court is directed to affirm the Commission’s decision unless the decision was based on an unsupported finding of fact. Id.
¶ 19. Neither party disputes that Harris’s claim is what has been described as a “mental/mental” claim. “[A] ‘mental/mental’ injury is a mental or nervous injury stemming from mental stimulus, ‘with no physical component in either the cause or the disabling consequence.’ ” Hosp. Housekeeping Sys., Inc. v. Townsend, 993 So.2d 418, 424 n. 1 (Miss.Ct.App.2008) (quoting 3 Larson’s Workers’ Compensation Law, § 56.06(3) (2000)). “[W]hen [a] claimant seeks benefits as a result of a compensable mental injury, the burden of proof is raised to clear and convincing evidence of a causal connection between the injury and employment.” Id. at 423 (¶ 19) (citing Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). “[W]ith a mental/mental claim, the claimant is also required to show that the mental injury was ‘caused by something more than the ordinary incidents of employment.’ ” Id. at 424 (¶ 21). “In general, where the claim is based upon a mental or nervous disease, it is viewed with the normal suspicion attending claimed disabilities which have no physical cause traceable to objective findings, and the burden of proof, which rests upon the claimant, is greater than [in] ordinary cases.” Smith and Sanders, Inc. v. Peery, 473 So.2d 423, 425 (Miss.1985) (citation omitted).
¶ 20. “When our standard of review is applied ... [to] any case involving the claim that a mental injury is compen-sable through worker’s compensation benefits, it dictates that there must be substantial evidence for the Commission’s finding that [a claimant] met [the] burden of proof.” Hospital Housekeeping Systems, Inc., 993 So.2d at 425 (¶ 24). In the context of reviewing an administrative agency’s decision, “substantial evidence” is “something more than a ‘mere scintilla’ or suspicion.” Id. Substantial evidence has also been defined as “such relevant evidence as reasonable minds might accept as adequate to support a conclusion.” Id. Additionally, substantial evidence has been described as “that which provides an adequate basis of fact from which the fact in issue can be reasonably inferred.” Id.
¶ 21. Because Harris raised a “mental/mental” claim for worker’s compensation benefits, he was required to demonstrate clear and convincing evidence of a causal link between his later diag *849 nosed paranoid schizophrenia and the earlier events that happened at SCSI. Id. at 426 (¶ 30). Clear and convincing evidence has been defined as:
that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
Moran v. Fairley, 919 So.2d 969, 975 (¶ 24) (Miss.Ct.App.2005) (quoting Travelhost, Inc. v. Blandford, 68 F.3d 958, 960 (5th Cir.1995)). In fact, “[c]lear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level.” Id.
¶ 22. Based on a proper review of the Commission’s decision — within the bounds of the standard of review — we find that there was substantial evidence to support the Commission’s conclusion that Harris had failed to present clear and convincing evidence that his paranoid schizophrenia was causally connected to his six-month employment at SCSI.[3] Dr. Hiatt explicitly opined that Harris’s schizophrenia could not have been caused by anything that happened at SCSI. Dr. Hiatt stated: “It is my opinion within a reasonable degree of medical certainty that the chronic paranoid [schizophrenia suffered by Parnell Harris was not caused by employment at [SCSI]. Specifically ... the pattern of comments by the supervisor and owners of [SCSI] did not ‘cause’ [schizophrenia.” There is nothing in the record to undermine Dr. Hiatt’s conclusion.
¶ 23. Dr. Ladner, one of three psychiatrists who had personally treated Harris, noted that Harris discussed events at SCSI during counseling treatments, but Dr. Ladner did not relate Harris’s schizophrenia with Harris’s employment with SCSI. What is more, Dr. Ladner did not even diagnose Harris as suffering from schizophrenia. Dr. Ladner referred Harris to Dr. Pineda. Dr. Pineda, a psychiatrist, diagnosed Harris with schizophrenia. Dr. Pineda noted that Harris referred to events that occurred at SCSI, but Dr. Pineda never explicitly related Harris’s mental illness to Harris’s employment at SCSI. Dr. Andrew Bishop treated Harris after Dr. Pineda. Dr. Bishop, also a psychiatrist, never mentioned a causal connection between Harris’s mental illness and Harris’s employment.
¶ 24. The Commission found no causal connection between Harris’s mental illness and his employment at SCSI. Specifically, the Commission found as follows:
In the case of a mental injury which arises in the absence of any physical trauma, the Claimant must show by clear and convincing evidence that the mental injury has been caused or contributed to or aggravated by something more than the ordinary incidents of employment. This test of causation is by now familiar to all. It is our considered opinion that [Harris] has not presented clear and convincing evidence that his alleged mental injury is causally related to the alleged work incidents.
(Emphasis added). The Commission went on to find as follows:
Again, [Harris] did not seek medical treatment for his alleged medical condition until some [four] months after leav *850 ing [SCSI]. Since beginning treatment at the Jackson ... Mental Health Center, [Harris] has treated with [sic] three different psychiatrists. He was eventually diagnosed by a psychiatrist at that clinic with paranoid schizophrenia. At no time during his treatment did any of his physicians specifically causally relate his medical condition to the alleged events or incidents at work. Although the records reference [Harris’s] work with [SCSI] and give a history of events as reported by [Harris], the records do not state that [Harris’s] work caused his schizophrenia. In fact, the records indicate that [Harris] was affected by, and fearful of, many other things including utility workers at his house, the West Nile virus, mosquitoes, and strangers in general.
[[Image here]]
Dr. Hiatt is the only medical expert of record to give an opinion regarding causation as none of [Harris’s] other treating physicians were ever deposed and at no time in their records of treatment do they ever express an opinion concerning causation.
[[Image here]]
In the present case, there is ... no convincing medical opinion connecting [Harris’s] mental injury to his employment and [Harris’s] attempt to identify extraordinary incidents of employment are not only not corroborated, they are disputed in most every material respect.
¶ 25. To summarize, none of Harris’s three treating psychiatrists mentioned a causal connection between Harris’s mental illness and Harris’s employment at SCSI. As the Commission accurately noted, “none of [Harris’s] other treating physicians were ever deposed and at no time in their records of treatment do they ever express an opinion concerning causation.” Dr. Hiatt explicitly stated that there was no causal connection between Harris’s later development of mental illness and Harris’s employment at SCSI. Consequently, there was absolutely no testimony that there was any connection between Harris’s employment at SCSI and Harris’s eventual diagnosis of paranoid schizophrenia. Nor was there any testimony that an incident at work exacerbated or aggravated any pre-existing mental illness Harris might have had. It follows that there was substantial evidence to support the Commission’s conclusion that Harris had failed to present clear and convincing evidence that he was entitled to workers’ compensation benefits. The dissent would propose to remand Harris’s case to the Commission for a determination of whether Harris’s mental condition was exacerbated, aggravated, or contributed to by his employment at SCSI. We can perceive no reason that Harris could not have timely presented any evidence — assuming such evidence existed — that he was suffering from a preexisting mental illness during or prior to his employment at SCSI and that such illness was aggravated by his employment. We find that Harris’s first bite of the proverbial apple was quite adequate. Accordingly, we find that the circuit court erred when it substituted its view for that of the Commission’s. Therefore, we reverse the decision of the circuit court and reinstate the judgment of the Commission, in which the Commission found that Harris was not entitled to recover workers’ compensation benefits.
¶ 26. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REVERSED, AND JUDGMENT IS RENDERED TO REINSTATE THE DECISION OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
*851 GRIFFIS, P.J., MYERS, BARNES AND MAXWELL, JJ., CONCUR. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ISHEE AND RUSSELL, JJ. LEE, C.J., AND CARLTON, J„ NOT PARTICIPATING.

. At times, the Commission spelled McGowan’s name as “McGowin.” Both spellings refer to the same person.

. It would seem, as a fact-finder, the Commission may well have been justified in attaching great credibility to Hudson's affidavit since Hudson was directly facing his immediate demise.

. A claimant may also be entitled to benefits if an incident at work exacerbates or aggravates a mental condition. See Miss.Code Ann. § 71 — 3—3(b) (Rev.2000); Fought, 523 So.2d at 317-18; Radford v. CCA-Delta Corr. Facility, 5 So.3d 1158, 1163 (¶22) (Miss.Ct.App.2009); Daniels v. Peco Foods of Miss., Inc., 980 So.2d 360, 363 (¶ 10) (Miss.Ct.App.2008).