IRVING, P.J.,
dissenting:
¶ 27. Parnell Harris, who was employed as a machinist at Scott Colson’s Shop, Inc. (SCSI), filed a petition to controvert with the Mississippi Workers’ Compensation Commission (Commission) wherein he alleged that as result of “excessive verbal abuse and racial harassment by a supervisor,” over a six-month period, he had suffered a mental and emotional breakdown. The administrative judge (AJ), to whom the case had been assigned for hearing, agreed and rendered a fifteen-page opinion in which he found that “Mr. Harris’s mental condition is causally connected to his work; that the precipitating events at work were out of the ordinary.”[4]
¶ 28. The AJ summarized the pertinent evidence of harassment as follows:
On Mr. Harris’s second day of work, December 8, 1998, his supervisor, Mr. [Alex “Donnie”] McGowan[, who is a white male,] began racially harassing Mr. Harris. Mr. McGowan cursed him, used racial epithets, and threw things at him. As part of that harassment, Mr. McGowan hosted barbeques at the employer’s place of business for the white employees but did not invite Mr. Harris or the other black employees. Mr. McGowan also shoved Mr. Harris to one side while Mr. Harris was working on a machine.
In addition, Mr. McGowan continually criticized prominent blacks. For example, he once denounced O.J. Simpson to Mr. Harris and Mr. [Tony] McKay.
On another occasion[,] Mr. McGowan, in Mr. Harris’s presence, recounted a story to a non-employee about shooting off a black man’s penis. Mr. Harris reported that incident to the then owner, Scott Colson, but Mr. Colson did not do anything. Later[,] Mr. McGowan told Mr. Harris and Mr. McKay about an episode when Mr. McGowan’s uncle had wanted to Ml a black man. (In both of those incidents, Mr. McGowan used the word, “n-r,” to refer to the black men in his anecdotes.)
After hearing the second story, Mr. Harris clocked out and went home. After Mr. Harris got home, Mark Clay, who was in the process of buying the business, telephoned Mr. Harris. Mr. Clay stated that Mr. McGowan had realized that he had acted improperly, and that if Mr. Harris would return to work, Mr. McGowan would apologize to him. Mr. Harris agreed to meet about the situation at 7:00 a.m. the next day.
In the morning Messrs. Harris, Clay, Colson, and McKay met at the appointed time, but Mr. McGowan did not appear. During that meeting[,] Messrs. Clay and Colson apologized to Mr. Harris for Mr. McGowan’s behavior. Mr. Colson added, however, that Mr. Harris should not be so sensitive because Mr. McGowan was just that way.
Around 10:00 a.m.[,] Mr. McGowan arrived and told Mr. McKay that Mr. Harris might not work there much longer. At some point Mr. McGowan told Mr. Harris that if anyone sued Mr. McGow *852 an, that person would not live to enjoy any recovery from the lawsuit. [At][a]bout noon[,] Mr. Harris left work and did not return. Mr. Harris went home but was not able to sleep for three or four days because he feared for his life. He thought that Mr. Colson and Mr. McGowan would try to kill him, but he has not seen them since leaving work.
[[Image here]]
A coworker, Mr. [Jimmy] Hudson, witnessed some of the racial harassment directed toward Mr. Harris. Mr. Harris, however, believed that Mr. Hudson would not say anything that was adverse to Mr. Colson because Mr. Colson had given Mr. Hudson a job while Mr. Hudson had been out of prison on parole.
¶ 29. The Commission rejected the findings of its AJ and denied compensation. Upon appeal to the circuit court, the circuit judge, finding that the Commission’s decision was not supported by substantial evidence, reversed the decision of the Commission and ordered compensation. The majority reverses the judgment of the circuit court and reinstates the decision of the Commission.
¶ 30. Respectfully, I dissent. I believe that the Commission failed to consider whether Harris suffered from a mental infirmity during his employment with SCSI and, if so, whether that condition was exacerbated by the events that happened at SCSI. Accordingly, I would remand this case to the Commission with instructions to consider whether Harris’s schizophrenia had its onset during Harris’s employment with SCSI and, if so, whether the incidents at SCSI aggravated or exacerbated Harris’s then mental state.
¶ 31. It clear from the record that the Commission focused only on Harris’s post-employment, full-blown schizophrenia, not his mental condition during his employment with SCSI. Although Harris did not seek medical help during his period of employment with SCSI, there is a plethora of medical evidence pointing unmistakably to the conclusion that apparently something was wrong psychologically with Harris during his time at SCSI. First, it is undisputed that Harris was diagnosed with major depression and possible posttrau-matic stress disorder within four months of leaving his employment with SCSI. A little more than a year after leaving, he was diagnosed with schizophrenia. Second, according to Dr. Wood Hiatt:
Schizophrenia has varied and ominous symptoms that generally begin in late adolescence or early adulthood and usually continue throughout life. Most patients have a history of behavioral dysfunction — primary social and learning difficulties. Diagnostic features of schizophrenia include auditory hallucinations (generally voices that converse with or about the patient) and delusions (often the paranoid belief that external forces are conspiring against the patient) .... In addition to these overt psychotic or “positive” symptoms, various deficits or “negative” symptoms occur .... Depressive symptoms are common at all phases of schizophrenia. Positive symptoms are generally treatable with antipsychotic medication[,] but there are no treatments with established efficacy for primary negative symptoms.
¶ 32. So, the first question is: Does the evidence undergird the conclusion that Harris was suffering from some mental condition during his employment with SCSI? That is a different question from whether the incidents at SCSI caused the condition. The second question is: If the evidence warrants a finding that Harris was suffering from a mental condition, is there clear and convincing evidence that *853 the incidents at SCSI aggravated or exacerbated that condition?
¶ 33. A claimant may be entitled to benefits if an incident at work exacerbates or aggravates a mental condition. See Miss.Code Ann. § 71-3-3(b) (Rev.2000); Fought v. Stuart C. Irby Co., 523 So.2d 314, 317-18 (Miss.1988); Radford v. CCA-Delta Corr. Facility, 5 So.3d 1158, 1163 (¶ 22) (Miss.Ct.App.2009); Daniels v. Peco Foods of Miss., Inc., 980 So.2d 360, 363 (¶ 10) (Miss.Ct.App.2008). Further, when the claim is for a mental injury without accompanying physical trauma, the claimant must show by clear and convincing evidence that the mental injury has been caused or aggravated by something more than the ordinary incidents of employment. Bates v. Countrybrook Living Ctr., 609 So.2d 1247, 1248 (Miss.1992). It cannot be legitimately argued that the racial invec-tiveness used by Harris’s supervisor over a six-month period is part of the ordinary incidents of employment. The fact that none of the invectives were directed at Harris personally, as found by the Commission, changes nothing. Nor does it preclude a finding that that sort of conversation in the workplace can have an emotional impact upon a person who may already be suffering from mental issues.
¶ 34. The AJ clearly considered whether the incidents at SCSI exacerbated Harris’s mental condition, as shown by his findings: “It is clear that Mr. Harris’s mental condition has rendered him permanently and totally disabled. The question remains, however, as to whether Mr. Harris’s work ‘contributed to or aggravated or accelerated ... in a significant manner’ his mental condition.” The AJ concluded that Harris’s employment had contributed to his mental condition and noted the following:
The psychiatrists who actually treated Mr. Harris did not explicitly opine as to causation, but they certainly accepted Mr. Harris’s history and implicitly linked that history to Mr. Harris’s mental condition. In this case[,] the [AJ] is struck by the fact that the records of the treating psychiatrists are replete with references to Mr. Harris’s work for [SCSI]. Those psychiatrists noted that Mr. Harris dreamed and hallucinated about events at work on an almost daily basis.
In addition, there is no indication that Mr. Harris suffered from a disabling mental illness before he began working for [SCSI], In that regard, it may be true, as Dr. Hiatt implied that Mr. Harris had developed schizophrenia before he started his job with [SCSI ], but it is clear that the symptoms of Mr. Harris’s mental illness did not become disabling until after he became employed at ... [SCSI ]_
(Emphasis added).
¶ 35. In order to present a complete picture of what the AJ was referring to in Harris’s medical records, I quote some relevant portions of those records. Harris’s intake form, dated October 19, 1999, from when he began seeing Dr. Mark Lad-ner, a psychiatrist at the Jackson Mental Health Center (Center), notes that Harris “reports sleep disturbances. Excessive anger due to abuse on last job where he was racially harassed.” The “problem history” on the same form notes that Harris’s difficulties “started after conflicts (racial) that led to him quitting in June.” Harris’s psychosocial assessment from the Center notes: “Client comes for intake complaining of being nervous all the time. Reports being ‘paranoid’ — feelings that people are going to harm him. Was given a death threat from his supervisor at work who also was racially [illegible] to his job.” The same form noted that Harris reported having flashbacks to things that happened *854 at work. The psychiatric evaluation by Dr. Ladner from Harris’s first visit to the Center noted:
The patient denies any past psychiatric history prior to December of 1998. He started working at a place called Scott Colson Shop [sic]. He was making horseshoes. He complained about the owner and supervisory who are both white. He said that they called him racial names. He said he actually felt “physically abused.” He describes one incident where the supervisor “knocked me out of the way when I was making the horseshoe. I know I was doing it right.” He continued to work until June of 1999[,] when he quit.... He has dreams about his supervisor at work. He will have distressing recollections during the day about things that occurred at work. He does not actually have any temper outbursts, just feelings of anger[,] and he has had homicidal ideations, but he denies any type of homicidal intentions or plans. He shows good judgment in saying[,] “I know I’d go to jail.” Furthermore, there were comments made at work that caused him to be afraid for his safety. He says that either his supervisor or [the] owner said once “if someone tries to sue me, they won’t make it to court.” Again, this is what the patient alleges was said at his previous place of employment.
Dr. Ladner’s June 8, 2000 notes state the following:
[Harris] says he is still depressed, anxious, having flashbacks and some paranoia[,] although I think this is more suspiciousness at this point. I had said he has a probable posttraumatic stress disorder and ... he seems to fit into the categories. He was confronted by a threat of serious injury. His response involved intense fear. He has dreams about these events and the stressing recollections about these events.
On August 8, 2000, Dr. Ladner stated the following regarding Harris: “He still periodically has auditory hallucinations and paranoia.... He says he is hearing the voices of the men he used to work with.”
¶ 86. Harris’s reports about what had happened at SCSI remained a continuing theme throughout his treatment records, regardless of which doctor he saw. On January 9, 2001, Dr. Mario Pineda, a psychiatrist who treated Harris, noted the following about Harris: “He still has frequent paranoid thinking and feels some people that used to work with him are watching him.” On December 18, 2001, Dr. Pineda observed the following: “Basically, the mother gives me the same report and that is [that] at night [Harris] seems to be talking to himself and he says that there are some type of nightmares that he is having about his job.” On March 12, 2002, Dr. Pineda noted: “[Harris] continues to have auditory hallucinations and then the patient replies to them. Usually they are referring to his old job.... ”
¶ 37. Dr. Hiatt’s expert report discussed Harris’s mental condition in depth and concluded: “It is my opinion within a reasonable degree of medical certainty that the chronic paranoid schizophrenia suffered by Parnell Harris was not caused by employment at [SCSI]. Specifically ... the pattern of comments by the supervisor and owners of [SCSI] did not ‘cause’ schizophrenia.” Nothing in Dr. Hiatt’s report addressed whether the incidents at SCSI exacerbated or aggravated Harris’s mental condition. Similarly, the Commission’s decision did not address whether the occurrences at SCSI exacerbated or aggravated Harris’s condition rather than caused it. As previously discussed, Harris is entitled to benefits even if the incidents *855 at SCSI merely exacerbated or aggravated a preexisting condition.
¶ 38. The majority finds that “[t]he record contains absolutely no evidence that Harris had been diagnosed with a mental illness at any time prior to or during his employment at SCSI.” While it is true that there is nothing to indicate that Harris had ever been diagnosed with a mental illness, the record provides evidence that Harris was mentally ill prior to the incidents at SCSI. In his affidavit, Hudson stated that Harris’s parents had asked Hudson to look after Harris. Hudson went on to aver that “Mr. Harris appeared to have some sort of psychiatric or emotional condition, as he talked to himself frequently.” In his deposition, McGowan noted that Harris frequently spoke or sang to himself while he worked; McGowan could not discern which, but he observed Harris’s lips moving when no one else was near him. I note that Harris’s habit of talking to himself is one symptom of his mental disease that is mentioned frequently in his medical records. Furthermore, Dr. Hiatt noted that paranoid schizophrenia “generally begin[s] in late adolescence or early adulthood.... ” When describing the “[diagnostic features” of paranoid schizophrenia, Dr. Hiatt first noted “auditory hallucinations,” which he described as “voices that converse with or about the patient.” I further note that no doctor ever concluded that Harris’s schizophrenia did not start prior to his employment at SCSI. While a formal diagnosis of any mental illness was never made prior to Harris’s employment at SCSI, I believe that there is evidence in the record suggesting that Harris was mentally ill prior to the incidents in question. As noted before, Harris never claimed that the incidents caused his schizophrenia; rather, Harris’s petition to controvert merely stated that the incidents caused him to have a mental breakdown.
¶ 39. Accordingly, I would reverse the circuit court’s decision and remand this case to the Commission for an on-the-record determination of whether Harris’s mental condition was exacerbated, aggravated, or contributed to by the incidents at SCSI.
ISHEE AND RUSSELL, JJ., JOIN THIS OPINION.

. The AJ also pointed out that the appeals referee with the Mississippi Department of Security, who reviewed Harris’s claim for unemployment benefits, found that Harris had good cause for leaving his employment with SCSI because Harris’s white supervisor repeatedly used racial slurs and called Harris derogatory names.